## No. 25-2166

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

Troy Lewald,

Plaintiff-Appellant,

v.

Pennsylvania Department of Corrections et al.,

Defendants-Appellees.

On Appeal from a Final Judgment of the
United States District Court for the Eastern District of Pennsylvania
Case No. 2:22-cv-04625, Hon. Chad F. Kenney

## OPENING BRIEF FOR PLAINTIFF-APPELLANT TROY LEWALD

Samuel Weiss
RIGHTS BEHIND BARS
1800 M Street, NW, FNT 1
  #33821
Washington, D.C. 20033

Kiarra Alleyne*
Lindsey Gradowski*
Galen K. Green*
  Student Counsel
*Motion to authorize student
practice pending

Becca Steinberg
D.C. Bar No. 1736190
Brian Wolfman
Natasha R. Khan
GEORGETOWN LAW APPELLATE
  COURTS IMMERSION CLINIC
600 New Jersey Ave., NW,
  Suite 312
Washington, D.C. 20001
(202) 662-9549

Counsel for Plaintiff-Appellant Troy Lewald

March 11, 2026

# Table of Contents

Introduction ................................................................................................ 1

Statement of Jurisdiction ........................................................................... 3

Issues Presented .......................................................................................... 3

Statutes Involved ........................................................................................ 5

Related Cases and Proceedings ................................................................. 5

Statement of the Case ................................................................................ 5

    I.     Factual background ....................................................................... 5

        A. PADOC initially accommodates Lewald's disability. ............... 5

        B. PADOC deletes Lewald's accommodations. .............................. 7

        C. PADOC denies Lewald's requests for accommodations. ............ 8

        D. Lewald is injured at work because he lacks
           accommodations. .................................................................. 11

    II.   Procedural background ............................................................... 12

Summary of Argument .............................................................................. 13

Standard of Review .................................................................................... 16

Argument .................................................................................................... 17

    I.     The district court erred in granting summary judgment to
        PADOC on Lewald's Rehabilitation Act claim. .......................... 17

        A. The district court incorrectly applied the Rehabilitation
           Act's causation standard. ...................................................... 18

        B. PADOC failed to provide Lewald with reasonable
           accommodations. ................................................................. 24

        C. A jury could find that Lewald is entitled to
           compensatory damages. ......................................................... 32

    II.   The district court erred in dismissing Lewald's ADA claim.
        ............................................................................................... 34

        A. The district court applied the wrong legal standard to
           the Eleventh Amendment inquiry. ....................................... 35

        B. If it reaches the question, this Court should hold that
           Title II of the ADA validly abrogated state sovereign
           immunity in the prison context ............................................ 37

Conclusion ............................................................................. 48

Certificate of Compliance ...........................................................

Statutory Addendum .................................................................

Addendum ...............................................................................

# Table of Authorities

**Cases**                                                   **Page(s)**

*Alexander v. Choate,*
469 U.S. 287 (1985) ............................................................ 19, 22, 23

*Bd. of Trs. of Univ. of Ala. v. Garrett,*
531 U.S. 356 (2001) ............................................................ 37, 44, 45

*Bowers v. NCAA,*
475 F.3d 524 (3d Cir. 2007) ............................ 34, 36, 37, 38, 39, 46, 47

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ........................................................................ 38

*Doe v. Princeton Univ.,*
30 F.4th 335 (3d Cir. 2022) ............................................................ 16

*Durham v. Kelley,*
82 F.4th 217 (3d Cir. 2023)
.......................................... 16, 18, 19, 20, 21, 22, 24, 26, 27, 30, 33, 35

*S.H. ex rel. Durrell v. Lower Merion Sch. Dist.,*
729 F.3d 248 (3d Cir. 2013) ............................................................ 32

*Forestal Guarani S.A. v. Daros Int'l, Inc.,*
613 F.3d 395 (3d Cir. 2010) ............................................................ 37

*Furgess v. Pa. Dep't of Corr.,*
933 F.3d 285 (3d Cir. 2019) ................ 17, 18, 19, 20, 21, 30, 31, 32, 33

*Glaesener v. Port Auth.,*
121 F.4th 465 (3d Cir. 2024) ............................................................ 16

*Guttman v. Khalsa,*
669 F.3d 1101 (10th Cir. 2012) ........................................................ 39

*Kimel v. Fla. Bd. of Regents,*
528 U.S. 62 (2000) ............................................................ 34, 38, 39

iii

*Meagley v. City of Little Rock,*
  639 F.3d 384 (8th Cir. 2011) ............................................................ 32

*Mengine v. Runyon,*
  114 F.3d 415 (3d Cir. 1997) ............................................................. 29

*Montanez v. Price,*
  154 F.4th 127 (3d Cir. 2025) ................ 17, 19, 20, 21, 22, 24, 27, 30, 32

*Muhammad v. Ct. of Common Pleas,*
  483 F. App'x 759 (3d Cir. 2012) .................................................. 20, 21

*Nev. Dep't of Human Res. v. Hibbs,*
  538 U.S. 721 (2003) ......................................................................... 36

*Pa. Dep't of Corr. v. Yeskey,*
  524 U.S. 206 (1998) ......................................................................... 17

*Pierce v. District of Columbia,*
  128 F. Supp. 3d 250 (D.D.C. 2015) ................................................. 22

*Porter v. Pa. Dep't of Corr.,*
  974 F.3d 431 (3d Cir. 2020) .............................................................. 5

*Tennessee v. Lane,*
  541 U.S. 509 (2004) ................. 18, 34, 35, 36, 37, 38, 39, 43, 45, 46, 47

*United States v. Georgia,*
  546 U.S. 151 (2006) .......................................................... 35, 36, 38, 42

## Statutes and Regulations

18 U.S.C. § 3626 ............................................................................. 47

18 U.S.C. § 3626(a)(1)(A) ................................................................ 48

28 U.S.C. § 1291 ............................................................................... 3

28 U.S.C. § 1331 ............................................................................... 3

28 U.S.C. § 1915(g) ........................................................................ 47

29 U.S.C. § 794(a) ........................................... 3, 13, 17, 20, 24, 30, 41

29 U.S.C. § 794(d) ................................................................ 21

42 U.S.C. § 1997 .................................................................. 41

42 U.S.C. § 1997a(a) ............................................................ 42

42 U.S.C. § 1997c(a)(1) ........................................................ 42

42 U.S.C. § 1997e(a) ............................................................ 47

42 U.S.C. § 1997j ................................................................. 42

42 U.S.C. § 12101(a)(3) ........................................................ 44

42 U.S.C. § 12111(9) ............................................................ 30

42 U.S.C. § 12112(a) ............................................................ 21

42 U.S.C. § 12132 ................................................ 4, 13, 21, 46

42 U.S.C. § 12202 ........................................................... 4, 34

28 C.F.R. § 35.150(a) ........................................................... 47

28 C.F.R. § 35.150(a)(2) ....................................................... 47

28 C.F.R. § 35.150(a)(3) ....................................................... 47

**Legislative Authorities**

H.R. Rep. No. 95-1058 (1978) ............................................... 40

H.R. Rep. No 101-485, pt. 2 (1990) ....................................... 45

H.R. Rep. No. 101-485, pt. 3 (1990) ...................................... 44

S. Rep. No. 92-1135 (1972) .................................................. 41

S. Rep. No. 101-116 (1989) .................................................. 45

*Civil Rights of Institutionalized Persons: Hearings on H.R.*
*10 Before the Subcomm. on Cts., C.L., & the Admin. of*
*Just. of the H. Comm. on the Judiciary,* 96th Cong. 4
(1979) ................................................................................ 42

*Civil Rights for Institutionalized Persons: Hearings on H.R. 2439 and H.R. 5791 Before Subcomm. on Cts., Civil Liberties, & the Admin. of Just. of the H. Comm. on the Judiciary*, 95th Cong. (1977) ............................................................ 41

*Civil Rights of Institutionalized Persons: Hearings on S. 1393 Before the Subcomm. on the Const. of the S. Comm. on the Judiciary*, 95th Cong. 639 (1977) ........................................... 42

*Corrections, Part VIII, Prisons, Prison Reform, and Prisoners' Rights: Michigan: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 92d Cong. 129-36, 153, 154 (1972) .................................................................. 40

*Oversight Hearing on H.R. 4498, Americans with Disabilities Act of 1988: Before Subcomm. on Select Educ. of the H. Comm. on Educ. and Labor*, 100th Cong. 50 (1988) ......................... 44

## Other Authorities

U.S. Comm'n on C.R., *Accommodating the Spectrum of Individual Abilities* (1983) ........................................................ 43, 45

# Introduction

Troy Vincent Lewald suffers from a debilitating condition that resulted from a degenerative disc disease, a herniated disc, and major spinal surgery. He has been imprisoned since 2019. For three years and across three facilities, the Pennsylvania Department of Corrections (PADOC) complied with its obligations under the Rehabilitation Act and the Americans with Disabilities Act (ADA) to accommodate Lewald's disability.

But, at his fourth placement, PADOC stopped providing accommodations even though Lewald's condition had not improved. PADOC failed to properly transfer Lewald's medical restrictions and refused to conduct the medical intake that its own policies require. PADOC then forced Lewald to work in food services, a job that was incompatible with his prior accommodations and hazardous to someone with Lewald's medical conditions.

Lewald alerted over a dozen prison staff members that he still needed accommodations. Staff members scorned these requests. Medical staff told Lewald that he was wasting their time, and his work supervisors threatened disciplinary action if he did not do the job that put his health and safety at risk. Even after PADOC added work restrictions to Lewald's file, nobody implemented them or even informed Lewald that they had been added.

Lewald warned his supervisor that his job duties would cause him injury—and, a month into the job, they did. After following orders to lift a large stack of trays, Lewald felt a pop in his back and dropped the trays in agony. This injury has now caused him years of pain.

Despite all this, the district court concluded that PADOC wasn't liable under either the Rehabilitation Act or the ADA. Both conclusions rely on an incorrect understanding of the applicable legal framework.

The district court found that PADOC could not be liable under the Rehabilitation Act because Lewald's disability was not the sole reason that PADOC denied him accommodations. The district court arrived at the wrong answer because it asked the wrong question. The correct question is whether Lewald's disability was the sole reason that he couldn't safely access the prison's work program.

When a person's disability is not accommodated, that disability can be the reason he is excluded from a program. Under the failure-to-accommodate standard, the test is simple: Was PADOC on notice that Lewald had a disability, and did PADOC fail to accommodate that disability? The answer to both questions is equally simple: Yes and yes.

Turning to the ADA, the district court found that PADOC was entitled to sovereign immunity because Lewald had not adequately alleged a constitutional violation. Again, the district court asked the wrong question. A constitutional violation is not necessary to establish a valid abrogation of sovereign immunity.

Instead, the right question is whether Title II validly abrogates sovereign immunity in the prison context. PADOC never raised—and the district court never addressed—that question. This Court should reverse and remand, so that the district court can address that question in the first instance. But if this Court takes on the issue, it should hold that Lewald's ADA claim may go forward. The historical record shows that Title II's application in the prison context is an appropriate response to the longstanding and intractable problem of discrimination against disabled prisoners.

## Statement of Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 1331. On November 30, 2023, the district court granted in part PADOC's motion to dismiss. Add. 1-19. The district court's order granting summary judgment to PADOC, Add. 20-34, and judgment, Add. 35, both entered on June 3, 2025, disposed of all of Lewald's remaining claims. Lewald timely filed a notice of appeal on June 12, 2025. Add. 36-39. This Court has jurisdiction under 28 U.S.C. § 1291.

## Issues Presented

**I.** Under the Rehabilitation Act, no "qualified individual" may "be excluded from the participation in … any program" "solely by reason of" his disability. 29 U.S.C. § 794(a). Under this provision, a covered entity, such as PADOC, must provide reasonable accommodations to individuals with disabilities, such as Lewald. But the district court held that Lewald

"failed to provide evidence that … his denial of requested work accommodations or his work placement" was solely caused by his disability. Add. 20. The first set of issues presented are:

**A.** Whether the district court applied the wrong legal standard when it analyzed the link between Lewald's disability and the prison's failure to accommodate, rather than the link between his disability and his lack of safe access to the prison work program.

**B.** Whether the evidence would allow a jury to find that PADOC failed to reasonably accommodate Lewald's disability.

**C.** Whether a jury could find that Lewald is entitled to compensatory damages because PADOC was deliberately indifferent to his need for accommodations.

**II.** Like the Rehabilitation Act, the ADA prohibits discrimination against individuals with a disability, *see* 42 U.S.C. § 12132, and provides that states "shall not be immune under the eleventh amendment ... for a violation of this chapter," 42 U.S.C. § 12202. The second set of issues presented are:

**A.** Whether the district court erred in holding that Lewald's ADA claim is barred by sovereign immunity because he did not allege a valid constitutional violation.

**B.** Whether Title II of the ADA validly abrogates state sovereign immunity in the prison context.

## Statutes Involved

Pertinent statutory provisions appear in the addendum to this brief.

## Related Cases and Proceedings

This case has not previously been before this Court, and Lewald is not aware of any other cases presenting similar issues currently pending before this Court or any other court, state or federal.

## Statement of the Case

### I.    Factual background

### A.    PADOC initially accommodates Lewald's disability.

Troy Vincent Lewald suffers from a degenerative disc disease, which affects his nervous and skeletal systems. JA 22-23 ¶ 9; JA 120. Because of this disability, Lewald is at high risk for herniation and has previously suffered a herniated disk that required spinal surgery. JA 120, 327, 426. Lewald's major life activities are severely limited by his disability. JA 23 ¶ 9.[1]

On January 24, 2019, Lewald began his prison term at SCI Phoenix, a PADOC facility. JA 22-23 ¶ 9. Per PADOC policy, Lewald underwent a medical-intake screening the next day and disclosed his disability.

---

[1] Lewald wrote his complaint "under penalty of perjury." JA 91. Thus, the complaint is an affidavit and must be considered as evidence at summary judgment. *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 443 (3d Cir. 2020).

JA 150, 273, 326-28. Medical staff entered restrictions into his file, including bottom-bunk status and no lifting. JA 171.

Lewald then underwent a series of transfers. He was first transferred to SCI Camp Hill. JA 337. His previous restrictions were successfully sent to the new facility. JA 128, 171, 332-35. At his mandatory medical intake, staff entered an additional restriction. JA 171.

A few months later, PADOC transferred Lewald to SCI Albion. JA 342, 347. The day after his transfer, medical staff told Lewald that his restrictions had been deleted. JA 40 ¶¶ 67-69. At a medical appointment a few days later, staff fixed the error. JA 40 ¶ 67. They labeled him as not medically cleared for a job in food services and added new restrictions, including that he be assigned only light-duty work. JA 171, 350-51.

At SCI Albion, these accommodations allowed Lewald to safely participate in the work program. JA 119-20, 142. Due to his spinal surgery and medical restrictions, Lewald was encouraged to work as an academic tutor on his cell block. JA 119-20. After several promotions, he became a Class III employee, earning $0.38 per hour. JA 41 ¶ 75; JA 142. In early December 2020, Lewald received another promotion with a pay raise to $0.42 per hour, which was set to begin in January 2021. JA 42 ¶ 83.

On October 4, 2021, Lewald was approved for an incentive-based transfer. JA 42 ¶ 79. On December 28, 2021, Lewald was transferred back to SCI Phoenix. JA 22 ¶ 9; JA 359.

### B.    PADOC deletes Lewald's accommodations.

Two days after Lewald was approved for transfer back to SCI Phoenix, all of his medical restrictions were deleted from his file. *See* JA 72 ¶ 226; JA 171, 384, 398. It is unclear how this happened, as the restrictions had not previously been set to expire and his chronic condition had not improved. JA 381, 398. When Lewald arrived at SCI Phoenix, his medical file didn't include his restrictions. *See* JA 355-64. He also did not receive a medical screening as required by PADOC policy. *See* JA 120, 150, 273.

As soon as he arrived at SCI Phoenix, Lewald tried to get his accommodations reinstated. JA 122. On his first full day at the new facility, Lewald informed prison staff that he had a "light-duty assign[ment]" restriction and had previously worked as a block tutor. JA 353. On January 6, 2022, Lewald received a response with instructions on how to interview to be a block tutor. JA 353. PADOC's response did not mention the requested accommodations. JA 353.

On January 13, 2022, Lewald was assigned to work in the food-services department starting the following week. JA 368. As indicated above, his previous accommodations would have barred him from this position. JA 171. And as explained in more detail below, he suffered a painful back injury just one month into the job. JA 53 ¶ 133; JA 393, 404.

### C.    PADOC denies Lewald's requests for accommodations.

**1.** In the four days between receiving the food-services assignment and starting work, Lewald tried to alert prison staff to his disability and need for accommodations. Lewald asked a unit counselor for help getting a light-duty work placement. JA 44 ¶ 94. The counselor replied that he's "not doing any of that, that's not [his] job" and stated that Lewald should "leave now." JA 45 ¶ 94.

Lewald also filed two written requests for accommodations before his first day. JA 366, 368. In both, Lewald highlighted his demotion in pay and flagged that his new job was not light duty. JA 366, 368. He also wrote that he is "unable to work in a kitchen job" because of his "medical disabilities" and requested a job appropriate for "someone with lite-duty medical restrictions." JA 366. Both responses dismissed his concerns about pay. JA 366, 369. The first response said nothing about his accommodations request; the second denied that he had medical restrictions and marked his complaint as frivolous. JA 366, 369.

**2.** After Lewald began his job, he filed repeated written requests for accommodations. Between January 17 (when he started his job) and February 18 (when he was injured at work), Lewald made six written requests to the medical team for reasonable accommodations, none of which were successful. JA 46 ¶¶ 99, 103; JA 48 ¶ 112; JA 51 ¶ 128; JA 52 ¶¶ 130-32; JA 378. In this time, he also filed written grievances, requests,

and appeals. JA 46 ¶ 102; JA 48-49 ¶¶ 110, 115-18; JA 370-71, 381, 391. Prison staff acknowledged receipt of each filing, then rejected or dismissed them. JA 48 ¶ 111; JA 50 ¶ 124; JA 372, 382, 391.[2]

On February 7, Lewald filed a final written request with the Deputy Superintendent because "[a]ll staff" had said that she was "the only person that can help" him get accommodations. JA 191, 391. He received a four-word response nearly four months later and three months after his injury: "Restrictions were updated 2/15/22." JA 391. But the restrictions added on February 15 were not actually implemented until after Lewald's injury. *See generally* JA 52-53 ¶¶ 131-33.

**3.** While he was filing these written grievances, Lewald was also verbally requesting accommodations from three groups of prison employees: his work supervisors, the housing unit staff, and medical staff.

Lewald spoke with his work supervisors twice to ask for reasonable accommodations, once on his first day and again two-and-a-half weeks into the job. JA 45 ¶ 97; JA 49 ¶ 119. Each time, supervisors promised to "look into it" but never followed up. JA 45 ¶ 97; JA 49 ¶ 119. His supervisor told him that "there [were] no lite-duty workers on her line

---

[2] After his injury, Lewald twice appealed the grievance denials. JA 373-74, 383-84. Prison staff dismissed or denied these appeals. JA 385, 389.

and not performing the tasks she requested would constitute disobeying a direct order." JA 381.

Lewald also asked the housing unit staff for help. The day after his job started, Lewald asked a unit manager for assistance reinstating his previous accommodations. JA 46 ¶ 98. The unit manager told him that there was "nothing she [could] do" and that Lewald "must report to work daily or … be issued a misconduct," which could result in disciplinary and adverse parole consequences. JA 46 ¶ 98. Then, on February 8, Lewald spoke to a different unit manager to ask for "help resolv[ing] the issue." JA 51-52 ¶ 129. The manager told him that "there's nothing she can do" and reiterated the consequences of refusing to work. JA 52 ¶ 129.

Lewald also asked medical staff for help. He first did so about a week after starting work, but medical staff said they "c[ould]n't help [him]" because he lacked documentation of a disability. JA 47 ¶ 104. He was told to contact SCI Albion to have his medical file transferred, even though the file had already been transferred without the medical restrictions. JA 121, 354-64. Lewald asked for a new medical assessment—which he should have received when he arrived at the facility, JA 120, 150, 273— but the staff member refused and chided him for "wasting [her] time," JA 47 ¶ 104.

On February 15, three days before his injury and six weeks after his initial request for accommodations, Lewald again visited medical staff. JA 52 ¶ 131. He emphasized his double bind: that he must either continue

to work in food services and risk injury or refuse to work and face disciplinary and adverse parole consequences. JA 393; *see also* JA 52 ¶ 131. The staff member said she "c[ould]n't help" and asked why he "ke[pt] harassing [her]." JA 52 ¶ 131; *see also* JA 393, 395.

Despite brushing off Lewald's complaints, the staff member *did* input medical restrictions (but took no steps to make sure they were implemented). JA 58 ¶ 158; JA 171, 382. Those restrictions included no high-risk-of-injury employment and no lifting more than 15 pounds. JA 58 ¶ 158; JA 171, 382. But Lewald didn't know the restrictions had been added. In fact, he continued to request accommodations because he had been told that the staff member "d[idn't] know how to" add them. JA 395. And, even after these restrictions were added, nobody made any changes to align Lewald's job with these restrictions, so he continued working in food services. *See generally* JA 52-53 ¶¶ 131-33.

### D. Lewald is injured at work because he lacks accommodations.

On February 18, 2022, just one month into working in food services, Lewald "felt a pop in his back" while unloading a stack of trays. JA 53 ¶ 133; *see* JA 393, 404. He dropped the trays as "pain radiated through his arms, shoulders and [shot] down his sciatic nerve." JA 53 ¶ 133. After Lewald "scream[ed] in pain," the supervisor entered Lewald's workspace and told him to continue working. JA 53 ¶ 133.

11

When Lewald explained that he was in immense pain and needed medical attention, the supervisor sent him to his cell. JA 393, 404.

Medical personnel did not see Lewald that day, and Lewald never received an ultrasound or x-ray to assess his injuries. JA 53 ¶ 133; JA 57 ¶ 154; JA 451. On February 23, he was released from kitchen duty and prescribed 600 mg of Motrin daily for two weeks. JA 55 ¶ 144; JA 419. He was later prescribed additional medication. JA 126. He continued to suffer "severe spine pain" for over a year. JA 451; *see* JA 418, 423, 426, 443, 446-48. Throughout this ordeal, Lewald wondered "[w]hy [he was] be[ing] punished for being disabled." JA 436.

Lewald continued to seek medical care and accommodations by filing and appealing complaints, inmate requests, and medical sick requests. JA 373-74, 383-84, 386-87, 397-98, 400-01, 406-07, 409-10, 421, 432-33, 435-36. It wasn't until months later, in August 2022, that Lewald was able to confirm that his medical clearances and restrictions had been reinstated. JA 73 ¶ 235; *see* JA 171.

## II.   Procedural background

Lewald sued PADOC and other defendants in the Eastern District of Pennsylvania.[3] As relevant, Lewald alleged that PADOC failed to comply with the Rehabilitation Act and the ADA, both of which prohibit covered entities from denying individuals with disabilities access to their

---

[3] The district court dismissed the claims against the other defendants, Add. 19, and Lewald does not pursue those claims in this appeal.

programs. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12132. Lewald alleged that PADOC failed to provide him with reasonable accommodations when it removed work restrictions that limited him to light-duty work and refused to reinstate those accommodations or provide him new ones. *See* JA 83-85. He sought injunctive relief and damages. JA 89-90.

The district court granted in part and denied in part PADOC's motion to dismiss. Add. 19. As relevant, the district court found that Lewald's ADA claim was barred by sovereign immunity because he "does not sufficiently allege any constitutional claims." Add 13. It allowed Lewald's Rehabilitation Act claim to go forward. Add. 14-16.

The district court later granted PADOC's motion for summary judgment as to Lewald's Rehabilitation Act claim, holding that Lewald had not shown that PADOC had denied him accommodations solely because of his disability. Add. 20, 27, 34. The district court reasoned that PADOC's removal of Lewald's accommodations, its subsequent denial of his accommodations, and Lewald's placement in food services could be attributed to prison staff's negligence or inadvertence. Add. 33-34.

## Summary of Argument

**I.A.** When an incarcerated person is excluded from a prison program solely because of his disability, the prison has an affirmative obligation to accommodate his disability. But the district court erroneously held that a prison is liable under the Rehabilitation Act only when a prisoner's disability is the sole reason that the prison failed to provide the required

accommodations. The district court's analysis focused on the link between Lewald's disability and his lack of accommodations. But the pertinent causal link is between Lewald's disability and his exclusion from the program. This Court has repeatedly held as much. And, if the result were otherwise, covered entities could invoke cost or inconvenience to deny with impunity any reasonable accommodation.

**B.** Applying the proper causation standard, Lewald established a prima facie case of discrimination. Once Lewald alerted PADOC to his disability, PADOC was obligated to accommodate it. And Lewald alerted PADOC repeatedly through verbal and written requests. But PADOC refused to provide any accommodations, resulting in Lewald's back injury. PADOC's failure to accommodate Lewald's disability was the sole reason Lewald couldn't safely participate in the prison work program. Therefore, PADOC violated the Rehabilitation Act.

**C.** A jury could find that PADOC acted with deliberate indifference, entitling Lewald to compensatory damages. The repeated written and verbal requests for accommodations demonstrate that PADOC knew Lewald's right to access the prison work program was substantially likely to be violated. Yet PADOC did nothing to prevent this violation.

**II.A.** The district court also erred in concluding that Lewald's ADA claim was barred by sovereign immunity. The district court categorically stated that "ADA lawsuits against state entities are barred by sovereign immunity, except where a plaintiff successfully alleges constitutional

violations." Add. 12. That's the wrong legal standard. Title II of the ADA validly abrogates sovereign immunity even in the absence of parallel constitutional violations, so long as the abrogation is valid prophylactic legislation under Section 5 of the Fourteenth Amendment. Because neither the district court nor PADOC addressed this question below, this Court should reverse and remand for the district court to undertake the proper analysis in the first instance.

**B.** If this Court reaches the issue, it should hold that Title II of the ADA validly abrogated state sovereign immunity in the prison context. In the ADA, Congress identified the right to be free from irrational disability discrimination. And it recognized the history and pattern of discrimination against individuals with disabilities.

In the prison context, Title II is a congruent and proportional response to this pervasive problem. Before the ADA, Congress spent decades legislating to stop state abuses of persons with disabilities, but with limited success. The ADA addressed this continued problem. In crafting the ADA, Congress compiled an immense record documenting the need to address discrimination against prisoners with disabilities. It held many hearings to address the issue and created a task force that compiled hundreds of cases where prisoners across the country had been subjected to discrimination because of their disabilities.

In light of this well-documented history, Title II was a reasonable approach. It has several important limitations. It extends only to

qualified individuals with disabilities who can prove that they suffered discrimination by reason of their disability and requires prisons to make accommodations only when they are reasonable. Title II's narrow approach is a valid abrogation of sovereign immunity in the prison context, so Lewald's ADA claim should be reinstated.

## Standard of Review

The district court's grant of summary judgment on Lewald's claim under the Rehabilitation Act is reviewed de novo. *See Glaesener v. Port Auth.*, 121 F.4th 465, 467 (3d Cir. 2024). All facts are viewed and all reasonable inferences are drawn in favor of the non-moving party, here Lewald. *See id.*

The district court's dismissal of Lewald's ADA claim is likewise reviewed de novo. *Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022). "The Court must accept all facts in the complaint as true, draw all reasonable inferences in the prisoner's favor, and ask only whether the complaint contains facts sufficient to state a plausible claim." *Durham v. Kelley*, 82 F.4th 217, 223 (3d Cir. 2023). "Complaints filed pro se should be construed liberally and held to 'less stringent standards than formal pleadings drafted by lawyers.'" *Id.* (citation omitted).

## Argument

### I.    The district court erred in granting summary judgment to PADOC on Lewald's Rehabilitation Act claim.

The Rehabilitation Act prohibits recipients of federal funds, such as PADOC, from discriminating against individuals with disabilities. *See* 29 U.S.C. § 794(a). To establish a prima facie case of discrimination, Lewald must show that he is (1) a "qualified individual" (2) "with a disability" (3) "who was excluded from participation in or denied the benefits of" a program, or otherwise discriminated against, (4) solely "by reason of his disability." *Montanez v. Price*, 154 F.4th 127, 146 & n.8 (3d Cir. 2025); *see Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 288-89, 291 (3d Cir. 2019). The first two elements—that Lewald is a qualified individual with a disability—are uncontested. *See* Add. 26; JA 104.

The third element—exclusion from a program—is also satisfied. PADOC agrees that "Lewald's work assignment falls within the broad meaning of 'program or activity' under the [Act]." JA 104; *see Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). The district court did not decide whether he was "excluded" from that program. Add. 26-27. He was.

A person who is allowed to participate in a non-accessible program is still "excluded" from or "denied the benefits of" that program in violation of the Rehabilitation Act. 29 U.S.C. § 794(a); *see Furgess*, 933 F.3d at 288, 291 & n.26; *see also infra* at 27-29. A prisoner with a disability must be able to participate in programs "on the same basis as other inmates."

*Durham v. Kelley*, 82 F.4th 217, 226 (3d Cir. 2023); *see also Tennessee v. Lane,* 541 U.S. 509, 513-14 (2004) (person with mobility impairments is denied meaningful access to a courthouse reachable only by stairs, regardless of whether he can crawl or be carried up). Here, it was not enough that Lewald was assigned to *a* position. *Contra* Add. 26. Because of his disability, that position was unsafe for him. So, PADOC failed to meet its obligation to provide safe access to the program. *See Furgess*, 933 F.3d at 288, 291.

That leaves the fourth element—exclusion solely by reason of disability—which we now address.

### A.   The district court incorrectly applied the Rehabilitation Act's causation standard.

The district court held that Lewald didn't show that his disability solely caused either the denial of accommodations or his work placement. Add. 27. That's incorrect because the district court asked the wrong question. The question is not whether Lewald's disability was the sole reason PADOC denied his accommodations. Rather, the question is whether Lewald's disability was the sole reason he could not access the prison work program. When asked that way—the proper way—the answer is straightforward: PADOC failed to accommodate Lewald's disability, and its failure allowed Lewald's disability to be the sole reason he couldn't safely participate in the work program.

18

A plaintiff can establish discrimination under the Rehabilitation Act by either "showing invidious discrimination" or demonstrating "a failure to provide reasonable accommodations." *Montanez v. Price*, 154 F.4th 127, 148 (3d Cir. 2025). This case involves the latter: a failure to accommodate. The Act requires that recipients of federal funds, including prisons, make "reasonable accommodations" to "assure meaningful access" to their programs. *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Regardless of which type of discrimination has occurred, the Rehabilitation Act applies a "sole causation" standard. *Furgess v. Pa. Dep't. of Corr.*, 933 F.3d 285, 291 (3d Cir. 2019). That means that "the sole cause of [a person's] deprivation" must be "his disability." *Id.*

The district court correctly recognized both (1) that "refusing to make reasonable accommodations is tantamount to denying access" and (2) that the sole-cause standard applies to Rehabilitation Act claims. Add. 25-26 (quoting *Durham v. Kelley*, 82 F.4th 217, 226 (3d Cir. 2023)). Yet the district court misunderstood how these two standards interact. Add. 25-26, 31.

The district court analyzed whether Lewald's disability was the sole reason his accommodations were denied. Add. 20, 27, 29-34. It held that prison staff's negligence and inadvertence were "alternative reasons" for the denial of accommodations. Add. 31.

That focused on the wrong causal link. Instead, the district court should have analyzed whether Lewald was "excluded from the

participation in" the work program "solely by reason of ... his disability." 29 U.S.C. § 794(a). The relevant causal link is between the plaintiff's disability and the defendant's deprivation of a benefit to him, not between the plaintiff's disability and the denial of accommodations. *See Furgess*, 933 F.3d at 291; *Muhammad v. Ct. of Common Pleas*, 483 F. App'x 759, 764 (3d Cir. 2012). Lewald had a disability, and PADOC failed to accommodate that disability; therefore, his exclusion was caused by his disability.

A few examples help illustrate Lewald's burden. In *Durham* and *Furgess*, the plaintiffs needed an accessible shower to access prison services "on the same basis as other inmates." *Durham*, 82 F.4th at 226; *see Furgess*, 933 F.3d at 291. The prisons denied them accessible showers. *Durham*, 82 F.4th at 226; *Furgess*, 933 F.3d at 291. As a result, the plaintiffs' disabilities were the sole cause of their inability to access prison showers. *Durham*, 82 F.4th at 226; *Furgess*, 933 F.3d at 292. In *Montanez*, the plaintiff needed accommodations to access three services: medical care, bedding, and personal hygiene necessities. 154 F.4th at 148. Because the prison failed to provide him with those accommodations, Montanez's disability was the sole cause of his exclusion from prison services. *Id.* Here, a proper Rehabilitation Act analysis would ask the same question: whether Lewald's disability was the sole reason he couldn't safely access the work program—a benefit that he was entitled to access.

These examples also illustrate what Lewald does *not* need to show. Furgess did not have to prove that his disability caused prison officials to move him to the Restricted Housing Unit (where there were no accessible showers). *See Furgess*, 933 F.3d at 291. Durham did not have to prove that his disability caused prison officials to deny him a shower chair and ignore his complaints of pain. *See Durham*, 82 F.4th at 226. Montanez did not have to prove that his disability caused prison officials to leave him in his cell without access to personal-hygiene necessities or bedding. *See Montanez*, 154 F.4th at 148. Lewald doesn't need to prove that his disability caused prison officials to deny him accommodations either.

This understanding aligns with how the causation standard applies in the ADA context. Unlike the Rehabilitation Act, the ADA uses a "but-for" causation standard. *Durham*, 82 F.4th at 226**.** Under the ADA, a "plaintiff must demonstrate that, but for the failure to accommodate, he would not be deprived of the benefit he seeks." *Muhammad*, 483 F. App'x at 764. The ADA and the Rehabilitation Act are otherwise substantively identical, *Furgess*, 933 F.3d at 288, so the ADA's but-for link operates in the same way as the Rehabilitation Act's sole-cause connection. The inquiry under both Acts is about the deprivation of a benefit rather than the reason accommodations were denied. 29 U.S.C. § 794(d); 42 U.S.C. §§ 12112(a), 12132.

This understanding of causation also makes sense. The Rehabilitation Act and the ADA impose an affirmative obligation on covered entities to

protect Americans with disabilities—an obligation that's at its "apex in the prison context 'because inmates necessarily rely totally upon [prisons] for all of their needs.'" *Montanez*, 154 F.4th at 144 (quoting *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 269 (D.D.C. 2015) (Jackson, J.)). But PADOC's view of causation—which lacks any precedential support—would allow institutions to "ignore[]" the needs of disabled individuals, as long as the institutions lacked "discriminatory animus." JA 104 (citation omitted).

That view would nullify the Rehabilitation Act's requirement to provide reasonable accommodations. It would allow entities to deny reasonable accommodations because they cost money, were inconvenient, or, as one case colorfully described it, because prison officials thought the plaintiff was an "asshole." *Durham*, 82 F.4th at 226.

The Rehabilitation Act and ADA were enacted to combat discrimination not necessarily stemming from "invidious animus" but rather from "indifference" and "benign neglect." *Alexander*, 469 U.S. at 295. And the obligation to accommodate imposed by those laws is affirmative. As the district court recognized, covered entities must make reasonable accommodations. *See* Add. 25. So, ignoring the need for accommodations—that is, being indifferent, apathetic, or unresponsive—undeniably violates the Rehabilitation Act's accommodation command.

The district court's improper application of the causation standard led it to consider irrelevancies. The district court repeatedly emphasized that

Lewald's restrictions were removed due to prison officials' inadvertence and negligence. Add. 30, 33 n.4, 34. We've already explained (at 19-21) that PADOC's reason for removing Lewald's restrictions is irrelevant. But even assuming (incorrectly) that it is relevant and further assuming (also incorrectly) that the prison officials here were merely inadvertent or negligent, that has nothing to do with causation.

Negligence and inadvertence do not themselves cause inaccessibility. Rather, the (in)action that caused the lack of access was the failure to provide Lewald with accommodations. "Negligence" *could* describe the state of mind of discriminators when they engage in discriminatory actions. But as we've explained, that's not relevant to causation. And, besides, plaintiffs are not required to prove invidious discrimination. *See Alexander*, 469 U.S. at 295-96. Yet requiring Lewald to prove officials' state of mind would do just that.

To sum up: The program Lewald sought to access was the prison's work program. Add. 26; *see* JA 104. Because of his disability, he needed accommodations to safely and meaningfully access it. Lewald's burden is simply to show that PADOC's failure to provide reasonable accommodations was the sole cause of his inability to safely participate in the work program. We now turn to that issue.

### B.    PADOC failed to provide Lewald with reasonable accommodations.

Under the proper causation standard, a jury could find that Lewald satisfies the fourth element of a prima facie case: discrimination "solely by reason of … his disability." 29 U.S.C. § 794(a). In the context of a failure-to-accommodate claim, this element is satisfied when (1) the prison had an obligation to accommodate the plaintiff's disabilities and (2) it refused to do so. *Montanez v. Price*, 154 F.4th 127, 148 (3d Cir. 2025). That's what happened here. PADOC failed to accommodate Lewald's disability. As a result, Lewald was unable to safely access the prison work program solely by reason of his disability.

**1. Obligation to accommodate.** "The duty to accommodate is triggered when a disabled person's need for an accommodation becomes known," which typically occurs when he "requests an accommodation." *Montanez*, 154 F.4th at 148. These requests can be made to prison staff, such as the medical team or correctional officers. *Durham v. Kelley*, 82 F.4th 217, 222 n.1, 226 (3d Cir. 2023). When a disabled individual asks for reasonable accommodations, the institution has an "affirmative duty" to provide them. *Montanez*, 154 F.4th at 148; *see Durham*, 82 F.4th at 226.

**a.** No one questions that Lewald is disabled. *See* JA 104. He needed work accommodations that reflected his prior medical restrictions of "no food service" and "no lifting." JA 170-71. Given his diagnosed medical

condition, he was "unable to work in a kitchen job or perform those duties" and instead needed to be assigned to a job "that c[ould] be performed by someone with lite-duty medical restrictions." JA 366.

Lewald's repeated requests alerted the prison to his need for accommodations. As detailed above (at 7-11) in the weeks leading up to his injury, Lewald filed repeated written requests and spoke with his work supervisors, medical staff, and housing unit staff to plead for disability accommodations. *See, e.g.*, JA 122-23, 381, 391, 412-14. His requests relayed that "[he] need[ed] [staff] assistance getting [his] medical restrictions transferred." *E.g.*, JA 391.

PADOC's own actions show that prison officials knew Lewald needed accommodations. A prison staff member entered some restrictions three days before his injury: "no high risk of injury," "no intensive labor," "no lifting more than 15 pounds," and "no work at heights/elevations." JA 170-71. These restrictions were not implemented. *See* JA 413. And because nobody told Lewald that the restrictions were entered, he couldn't insist that the work program honor them. *See* JA 395. So, Lewald was forced to continue work in unsafe conditions under threat of punishment. *See* JA 53 ¶ 133; JA 142, 413. He was seriously injured three days after the restrictions were entered. *See* JA 53 ¶ 133; JA 413.

**b.** PADOC does not dispute that Lewald made frequent requests for accommodations. JA 104. But it argues that those requests were improper because he didn't fill out the appropriate "disability

accommodation request form." JA 104-05. This argument comes up short for three reasons.

First, a prison must accommodate a known disability regardless of how accommodations are requested. *See Durham*, 82 F.4th at 226. For example, informal verbal pleas to prison staff trigger the obligation to accommodate. *See id.* at 222, 226. By requesting accommodations directly from prison staff and ensuring that all of his written requests were marked as received, Lewald notified PADOC of his need for accommodations. *E.g.*, JA 372, 382, 391.

Second, PADOC's own policy and prior practices demonstrate that it had previously approved Lewald's disability accommodations without engaging in the procedure that PADOC now insists is always required. *Compare* JA 104-05, *with* JA 124-25. Lewald received his first three sets of medical restrictions—at SCI Phoenix in January 2019, SCI Camp Hill in February 2019, and SCI Albion in May 2019—without going through a formal accommodation process. JA 128; *see* JA 170-71. According to PADOC policy, staff must document medical history and restrictions at an intake conducted within fourteen days after a prisoner is transferred to a new facility. JA 318. For Lewald, PADOC followed this policy at every facility prior to 2021, eliminating any need for him to file a formal request. JA 326, 332-37, 342-47.

Third, on February 15, 2022, a medical staff member *did* enter medical restrictions for Lewald, JA 170-71, 391, even though he never filled out

the form that PADOC insists is required, JA 104-05. Now, in litigation, PADOC says that Lewald had to follow certain procedures before it would register the accommodations, but the facts demonstrate that doing so was never a precondition.

**2. Refusal to accommodate.** Because PADOC knew of Lewald's disability, he had a right to reasonable accommodations. Meaningful access to a prison program includes the ability to participate without significant pain, just as able-bodied prisoners could. *See Montanez*, 154 F.4th at 148; *Durham*, 82 F.4th at 226. So, when an incarcerated person needs a double mattress to sleep without substantial pain, the prison must provide the mattress if it can reasonably do so. *Montanez*, 154 F.4th at 148. And when a prisoner needs a cane to shower without pain, the prison must provide the cane, too. *Durham*, 82 F.4th at 226. Otherwise, these individuals are unable to access prison services "on the same basis as 'able-bodied inmates.'" *Montanez*, 154 F.4th at 148; *see Durham*, 82 F.4th at 226.

But PADOC "repeated[ly] fail[ed]" to accommodate Lewald's disability. *Montanez*, 154 F.4th at 148. Due to PADOC policy, Lewald was required to do the food-services job he was assigned or face disciplinary action. JA 165. Food services "required [him] to do heavy-duty work" even though "nothing in [his] spine condition ha[d] improved." JA 381. Without an accommodation, Lewald was forced not only to endure pain, but to risk and ultimately sustain injury while participating in the

assigned job that he could not turn down without suffering severe consequences. JA 413.

PADOC's failure to accommodate began immediately after Lewald's arrival at the facility. His unit counselor dismissed Lewald's initial request for work accommodations, responding that he's "not doing any of that." JA 45 ¶ 94. A few weeks later, when Lewald asked the medical team to find his previous medical documentation, a staff member responded that she "c[ould]n't help." JA 47 ¶ 104. So, Lewald asked for an alternative—a new medical examination to evaluate his need for accommodations. JA 47 ¶ 104. She again dismissed his request and asked Lewald why he was "wasting [her] time." JA 47 ¶ 104.

Finally, three days before his injury, Lewald returned to the medical team to request proper work accommodations only to be excoriated for "harassing" them about his disability. JA 52 ¶ 131. And while filing a grievance appeal, Lewald questioned why he "continue[d] to be punished for being disabled." JA 436.

Rather than accommodating Lewald's disability, PADOC threatened him. *See* JA 46 ¶ 98. His supervisors "demand[ed] that [he] perform tasks … which [he was] physically unable to perform." JA 370. And prison staff warned that he would be disciplined if he did not perform those tasks. JA 46 ¶ 98. PADOC was well acquainted with its policy that "[f]ailure to report to or refusal to work is regarded as a misconduct." JA 165. As a result, Lewald faced an impossible choice: PADOC's demands forced him

to either work and risk injury or "disobey a direct order," which could "subject [him] to disciplinary action." JA 370.

**3. Causation.** The district court raised three alternative reasons that Lewald was denied access to the work program. None of them pass muster.

**a.** The district court held that Lewald's requests were unconnected to the prison "program" at issue because he asked to be a block tutor, instead of requesting accommodations within the food-services position specifically. Add. 26. The district court misunderstood what constitutes the prison work program. Recall that a "medically cleared inmate must accept any work/school assignment" across the entire work program. JA 251. Because it forces prisoners to accept any assignment, the prison treats the work program as a single program. And although PADOC did not have to accommodate Lewald by making him a block tutor, PADOC was not entitled to deny Lewald accommodations entirely; rather, it needed to accommodate his disability in some other reasonable manner. *See Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997) (Rehabilitation Act requires parties to engage in an interactive process to arrive at a reasonable accommodation).

The prison work program had multiple positions—including food-services worker and block tutor. Lewald repeatedly asked to be reassigned to a block tutor position. "The term 'reasonable accommodation' may include … reassignment to a vacant position."

42 U.S.C. § 12111(9). The right accommodation might have been reassignment to block tutor, reassignment to another position, or even placement on a waitlist. But asking for reassignment is not inherently unreasonable.

The bottom line is that, within the overall work program, Lewald should never have been cleared to work in food services. Both Lewald and his work supervisors knew that someone with medical disabilities requiring light-duty work could not participate in food services. JA 366, 381. PADOC could not withhold reasonable accommodations that it knew Lewald needed. *See Montanez*, 154 F.4th at 148.

**b.** The district court uncritically accepted PADOC's disingenuous assertion that Lewald wanted to be a block tutor only because it paid more. *See* Add. 32-33. As a food-services worker, he earned $0.38 an hour. JA 373. As a block tutor, he could have earned $0.42 an hour. JA 373.

Whether Lewald was motivated by the additional four cents is irrelevant. Legally, PADOC was obligated to provide Lewald with reasonable accommodations. *See Montanez*, 154 F.4th at 148; *Durham*, 82 F.4th at 226. That's true whether or not he also expressed concerns about pay. Even something as serious as prisoner misconduct "does not excuse the prison from its duty to reasonably accommodate prisoners with disabilities." *Furgess*, 933 F.3d 285, 291 (3d Cir. 2019). A plaintiff's motivation is not part of the legal test to evaluate discrimination. *See* 29 U.S.C. § 794(a).

Besides, it's not true that Lewald sought out the block tutor position only for higher pay. Lewald's written requests consistently referenced his status of "lite-duty with medical disabilities" and that other jobs placed his "health and safety … at grave jeopardy." JA 366, 370. In fact, his medical restrictions were the reason that he was "push[ed] towards being a block tutor" in the first place. JA 120.

**c.** The district court also suggested that Lewald was denied accommodations due to PADOC's "inadvertence or ignorance," meaning that the denial wasn't a failure to accommodate. Add. 33 n.4. That's wrong for two reasons.

First, we have already addressed (at 18) that the relevant inquiry centers on the cause of Lewald's inability to access prison services, not on the cause of PADOC's denial of Lewald's accommodations. *See Furgess*, 933 F.3d at 291. PADOC's deletion of Lewald's medical restrictions in preparation for his transfer can't serve as a "superseding or intervening cause" of Lewald's deprivation. *Id.* That alone renders irrelevant the district court's suggestion that PADOC was simply inadvertent.

Second, and alternatively, in violating its own policies, PADOC's actions went beyond mere inadvertence. PADOC policy requires that the medical team transfer the entire medical record and perform a health screening after a prisoner arrives at any prison. JA 318. By its own measure, PADOC retained the responsibility to properly record Lewald's medical restrictions and provide appropriate work accommodations in

line with its obligation under the Rehabilitation Act. As we now explain, PADOC's failure to abide by its own policies is more than inadvertent, entitling Lewald to compensatory damages.

### C. A jury could find that Lewald is entitled to compensatory damages.

To recover compensatory damages under the Rehabilitation Act, a plaintiff must demonstrate that the defendant acted with deliberate indifference. *Montanez v. Price*, 154 F.4th 127, 148-49 (3d Cir. 2025). The district court did not discuss whether PADOC acted with deliberate indifference. Add. 34 n.5.

A defendant acts with deliberate indifference when it (1) had knowledge that the plaintiff's federally protected right was "substantially likely to be violated" and (2) failed to act. *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 292 (3d Cir. 2019). A plaintiff need not prove "personal ill will or animosity toward the disabled person," but must show a deliberate choice to refrain from acting, rather than just negligence. *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) (quoting *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011)).

First, a jury could find that prison officials knew Lewald's rights were substantially likely to be violated. This element is satisfied if a defendant both "knew about [a plaintiff's] need for" accommodations and knew that the accommodations were not being provided. *Furgess*, 933 F.3d at 292. Knowledge is established when a plaintiff verbally alerts a defendant to

the need for accommodations, even if the plaintiff has not filed a specific form. *See Durham v. Kelley*, 82 F.4th 217, 222 n.1, 226 (3d Cir. 2023).

Lewald has identified multiple prison staff who knew about his need for accommodations and that they were not being provided. Staff knew that kitchen duty was not appropriate for someone restricted to light-duty work. *See supra* at 9-10; JA 381. Lewald made repeated requests to his work supervisors, counselor, unit manager, and medical staff for a work assignment that complied with his light-duty work restriction. *See supra* at 8-11. And he did more than verbally request accommodations: He filed multiple written requests and grievances. *See supra* at 8-9; JA 123, 366, 368, 381, 391. Accommodations were entered into Lewald's medical file three days before the injury, JA 170-71, 382, but prison staff did not implement them, JA 413.

Second, the prison failed to accommodate Lewald's disability despite knowing his rights were substantially likely to be violated. This element is satisfied when a defendant's failure to provide accommodations results in a violation of a plaintiff's rights. *Furgess*, 933 F.3d at 292. We have shown above that PADOC's failure to accommodate Lewald's disability resulted in his inability to access the prison work program. *See supra* at 24-32. Lewald was continually forced to either comply with orders at work (risking his safety) or refuse those orders (risking disciplinary and parole consequences). JA 370. So, PADOC was deliberately indifferent to its violation of Lewald's right to reasonable accommodations.

## II.    The district court erred in dismissing Lewald's ADA claim.

The district court was wrong to conclude that Lewald's ADA claim is barred by sovereign immunity. Title II of the ADA contains a clear expression of congressional intent to abrogate States' sovereign immunity. 42 U.S.C. § 12202; *see Tennessee v. Lane*, 541 U.S. 509, 518 (2004). The only remaining question is whether Congress "acted pursuant to a valid grant of constitutional authority." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000).

In answering this question, the district court applied the wrong legal standard. It incorrectly stated that Lewald was required to plead a parallel constitutional violation to overcome PADOC's invocation of sovereign immunity. Add. 12. That's not a requirement. This Court should reverse and remand for the district court to apply the proper legal standard in the first instance.

If this Court does decide the issue in the first instance, it should hold that Title II of the ADA validly abrogated sovereign immunity in the prison context, just as Title II validly abrogated sovereign immunity in the contexts of public education and the administration of judicial services. *See Bowers v. NCAA*, 475 F.3d 524, 554-56 (3d Cir. 2007); *Lane*, 541 U.S. at 534. Title II's application in the prison context is valid because it is congruent and proportional to the long and pervasive history of discrimination against prisoners with disabilities.

## A.    The district court applied the wrong legal standard to the Eleventh Amendment inquiry.

Without further analysis, the district court stated a blanket rule that "ADA lawsuits against state entities are barred by sovereign immunity, except where a plaintiff successfully alleges constitutional violations." Add. 12. As support for this proposition, the district court cited *Durham v. Kelley*, 82 F.4th 217, 228-29 (3d Cir. 2023). *Durham* does not stand for this proposition; in fact, *Durham* directly contradicts it.

*Durham* invokes Supreme Court precedent that recognizes two circumstances under Title II of the ADA validly abrogated sovereign immunity. One way—recognized by the district court here—"is to plead a companion constitutional claim arising from the same facts as the ADA claim." *Durham*, 82 F.4th at 228. But, as *Durham* explains, that's not the only way to establish a valid abrogation. *See id.* The other way, discussed in more detail below (at 38), "is to follow *Lane*'s three-step method for determining if Congress validly enacted prophylactic legislation under § 5" of the Fourteenth Amendment. *Durham*, 82 F.4th at 228. This latter approach applies in the absence of a constitutional violation. *Id.*; *see United States v. Georgia*, 546 U.S. 151, 159 (2006). Put differently, *Durham*—cited by the district court for the proposition that a constitutional violation is required—expressly says the opposite.

In recognizing that Title II of the ADA may validly abrogate sovereign immunity even absent a parallel constitutional violation, *Durham*

articulated the same rule that the Supreme Court has established and this Court has applied. In *Tennessee v. Lane*, the Supreme Court held that, as applied to the right of access to courts, Title II is a valid exercise of congressional authority even absent a constitutional violation. 541 U.S. 509, 533-34 (2004). In *United States v. Georgia*, the Supreme Court similarly recognized that Congress's abrogation of sovereign immunity may "nevertheless [be] valid" where "misconduct violated Title II [of the ADA] but did not violate the Fourteenth Amendment." 546 U.S. at 159. In *Bowers v. NCAA*, this Court held that Title II validly abrogated sovereign immunity in the context of public education, even in cases where a person's constitutional rights have not been violated. 475 F.3d 524, 554-56 (3d Cir. 2007).

Each of these cases recognized that a parallel constitutional violation is not necessary to establish a valid abrogation of sovereign immunity under Title II of the ADA. They did so because "Congress's § 5 authority can sweep in conduct that may possibly be constitutional." *Bowers*, 475 F.3d at 551. Section 5 permits Congress to "proscribe[] facially constitutional conduct to prevent and deter unconstitutional conduct." *Lane*, 541 U.S. at 518 (quoting *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727-28 (2003)).

Because of its error, the district court did not consider whether Title II of the ADA was a valid abrogation of state sovereign immunity under Section 5 of the Fourteenth Amendment. *See* Add. 12-13. And PADOC

did not raise the Section 5 issue below. *See* PADOC Mot. to Dismiss (ECF No. 86) at 14-16. It asserted only that "there has been no congressional abrogation," but did not even acknowledge the express congressional abrogation contained in the ADA, let alone address whether that abrogation was valid. *Id.* at 16. This Court should therefore reverse and remand for the district court to consider the issue in the first instance. *See Forestal Guarani S.A. v. Daros Int'l, Inc.*, 613 F.3d 395, 401 (3d Cir. 2010).

> **B.    If it reaches the question, this Court should hold that Title II of the ADA validly abrogated state sovereign immunity in the prison context.**

As explained, Congress may abrogate a state's immunity by statute if it legislates through a valid exercise of its power under Section 5 of the Fourteenth Amendment. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). Congress's power to enforce the Fourteenth Amendment is broad and "is not limited to mere legislative repetition of [the Supreme Court's] constitutional jurisprudence." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001). Rather, Congress may remedy and deter actual or potential violations of constitutional rights by abrogating the states' immunity for violations of federal statutes that go beyond the Fourteenth Amendment's scope. *Garrett*, 531 U.S. at 356, 365 (2001); *see Bowers v. NCAA*, 475 F.3d 524, 550-51 (3d Cir. 2007). Congress enjoys "wide latitude" in enacting prophylactic legislation and determining whether it

is operating within the bounds of its authority. *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997).

The Supreme Court has laid out a three-step test for assessing whether an abrogation is valid: (1) Congress must have identified the constitutional right or rights it sought to enforce, (2) Congress must also have identified a history and pattern of state violations of those rights, and (3) the abrogation must be an appropriate response to a history and pattern of violations. *Lane*, 541 U.S. at 522-24, 529-30; *see Bowers*, 475 F.3d at 551. These steps help courts determine whether prophylactic legislation is congruent and proportional to the constitutional harms identified by Congress, and therefore valid under Section 5 of the Fourteenth Amendment. *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 80-83 (2000).

Here, the first two steps are straightforward. "The right at issue in this case, as in *Lane*, is the right to be free from irrational disability discrimination." *Bowers*, 475 F.3d at 554; *see Lane*, 541 U.S. at 522-23. Beyond the rights identified in *Lane*, Title II reasonable-accommodation claims also implicate the "constellation of rights applicable in the prison context," including the Eighth Amendment's protections against "inadequate medical care and inhumane conditions of confinement." *United States v. Georgia*, 546 U.S. 151, 162-63 (2006) (Stevens, J., concurring).

38

As for the second step, the Supreme Court has "concluded that Congress had clearly identified a history and pattern of disability discrimination with respect to public services." *Bowers*, 475 F.3d at 554; *see Lane*, 541 U.S. at 524-26. Thus, "the second prong ... was conclusively established with respect to Title II by the *Lane* Court." *Bowers*, 475 F.3d at 554 n.35.

That leaves step three. The Supreme Court has not "set forth an easily administrable test for determining proportionality or identified the factors that a court should consider in assessing congruence." *Guttman v. Khalsa*, 669 F.3d 1101, 1122 (10th Cir. 2012). But when Congress confronts "considerable evidence" that unequal treatment "has a long history, and has persisted despite several legislative efforts to remedy the problem," Congress is justified in concluding that additional prophylactic measures are necessary. *Lane*, 541 U.S. at 531. Put differently, when the harms that Congress sought to address are grave and intractable, as here, then Congress may be justified in crafting a powerful remedy. *See id.* at 523-24; *Kimel*, 528 U.S. at 88-89.

As discussed in depth below, Congress spent over a decade unsuccessfully attempting to stamp out the abuse of people with disabilities in state prisons. "Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this difficult and intractable problem warranted added prophylactic measures in response." *Lane*, 541 U.S. at 531 (internal

citations omitted). And Title II is a limited response to that pervasive problem, as it requires only reasonable (not optimal) accommodations for prisoners with disabilities and is subject to a variety of other restrictions on prisoners' ability to litigate. The third step is therefore satisfied.

**1. Pre-ADA congressional efforts.** Before enacting the ADA, Congress spent decades unsuccessfully attempting to address state abuses of prisoners with disabilities. These efforts were prompted, in part, after state and federal courts actively "called upon the United States Department of Justice to protect institutionalized persons from deplorable conditions in institutions for the mentally disabled, juveniles, and prisoners, among others." H.R. Rep. No. 95-1058, at 7 (1978).

Congress held a series of hearings focused on the mistreatment of institutionalized persons with disabilities. The hearings revealed widespread abuse and neglect of disabled prisoners. *Corrections, Part VIII, Prisons, Prison Reform, and Prisoners' Rights: Michigan: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary*, 92d Cong. 136, 153-54, 159-60 (1972). One prison denied a paralyzed prisoner any means of washing himself; another forced a suicidal prisoner to remain in unsafe conditions that led to his suicide. *Id.* at 153-54. When one paralyzed prisoner was unable to access a sink, a guard told him the jail was "not a hotel." *Id.* at 154. When another injured his head due to severe and repeated epileptic seizures, prison officials returned him again and again to the same conditions where he was injured. *Id.*

Motivated in part by this alarming evidence, in 1973, Congress passed the Rehabilitation Act to secure the civil rights of institutionalized people with disabilities. That Act, which includes language that would later become part of the ADA, provided that no person with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Behind that straightforward language was Congress's overarching goal: "giv[ing] the institutionalized person a sense of being able to affect the environment in which he is confined and the rules and regulations in his day-to-day existence." S. Rep. No. 92-1135, at 25 (1972).

In 1980, nearly a decade of congressional investigation culminated in the passage of another important law: the Civil Rights of Institutionalized Persons Act (CRIPA). *See* 42 U.S.C. § 1997. CRIPA hearings had revealed even more extensive patterns of state abuse and indifference to institutionalized people with disabilities. In all, House and Senate Committees produced thousands of pages of reports and transcripts from days of testimony about the mistreatment of disabled persons who were institutionalized. *See, e.g., Civil Rights for Institutionalized Persons: Hearings on H.R. 2439 and H.R. 5791 Before Subcomm. on Cts., Civil Liberties, & the Admin. of Just. of the H. Comm. on the Judiciary*, 95th Cong. (1977).

The hearings revealed that prisons and other institutions were often themselves the perpetrators of abuse against prisoners with disabilities. One Senate committee heard testimony about a prisoner with a wheelchair locked in a cell for years, unable to move. *Civil Rights of Institutionalized Persons: Hearings on S. 1393 Before Subcomm. on the Const. of the S. Comm. on the Judiciary*, 95th Cong. 639 (1977). That committee also heard about a paralyzed prisoner whose bedsores grew infected with maggots when the prison did not clean or move him. *Id.* at 1067. Congress thus enacted CRIPA "to secure for thousands of institutionalized persons in this country the full guarantees of the U.S. Constitution and Federal laws that are designed to govern and protect all of us." *Id.* at 1 (statement of Sen. Birch Bayh, Chairman).

CRIPA authorized the Attorney General of the United States to file and intervene in civil lawsuits against prisons and other institutions that violate individuals' rights. 42 U.S.C. §§ 1997a(a), 1997c(a)(1). But CRIPA is not a means for individuals to safeguard their rights because it did not "expand ... the authority of parties other than the United States to enforce ... legal rights." *Id.* § 1997j. It also did not create any new substantive rights. *See Civil Rights of Institutionalized Persons: Hearings on H.R. 10 Before Subcomm. on Cts., Civil Liberties, & the Admin. of Just. of the H. Comm. on the Judiciary*, 96th Cong. 4 (1979) (statement of Rep. Tom Railsback).

CRIPA proved insufficient to protect the constitutional rights of prisoners with disabilities. After CRIPA's passage, the U.S. Commission on Civil Rights issued a report detailing persistent, widespread violations of the constitutional rights of institutionalized persons with disabilities. U.S. Comm'n on C.R., *Accommodating the Spectrum of Individual Abilities* (1983). Those violations include the "[i]mproper handling and communication with handicapped persons by law enforcement personnel," "inadequate treatment … programs in penal and juvenile facilities," and an "inadequate ability to deal with physically handicapped accused persons and convicts," including a lack of basic facilities like accessible cells and toilets. *Id.* at 168; *see also Lane*, 541 U.S. at 527.

**2. The ADA's approach.** The ADA addressed the continued and persistent abuse of disabled state prisoners that prior legislation had failed to remedy. It grew in part from the shortcomings of CRIPA and broadened the protections of the Rehabilitation Act. The ADA guarantees people with disabilities the right to be free from discrimination and have access to reasonable accommodations. It backed those basic guarantees by creating a private right of action to sue public entities that violate those protections.

In crafting the ADA, Congress compiled an immense record documenting the continuing need to address discrimination against prisoners with disabilities. The materials before Congress led it to identify "institutionalization" as a "critical area[]" in which

"discrimination against individuals with disabilities persists." 42 U.S.C. § 12101(a)(3). "[T]he record of mistreatment of prison inmates that Congress reviewed in its deliberations preceding the enactment of Title II was comparable in all relevant respects to the record that [was] sufficient to uphold the application of that title" in the context of court access. *Georgia*, 546 U.S. at 162 (Stevens, J., concurring).

When considering the ADA, Congress held thirteen hearings that included testimony from expert witnesses and individuals with disabilities about the mistreatment of people with disabilities in the penal system. *See Garrett*, 531 U.S. at 389-90 (Appendix A to opinion of Breyer, J., dissenting) (collecting congressional hearings). Individuals were "deprived of medications while in jail, resulting in further seizures," H.R. Rep. No. 101-485, pt. 3, at 473 (1990), and adults with traumatic brain injuries were jailed because of "aberrant behavior," *Oversight Hearing on H.R. 4498, Americans with Disabilities Act of 1988: Before Subcomm. on Select Educ. of the H. Comm. on Educ. and Labor*, 100th Cong. 50 (1988) (statement of Ilona Durkin).

Congress also created the Congressional Task Force on the Rights and Empowerment of Americans with Disabilities to produce reports and hold forums, which revealed "hundreds of instances of adverse treatment at the hands of state officials." *Garrett*, 531 U.S. at 379 (Breyer, J., dissenting). Some examples submitted to Congress included state officials arresting and holding deaf individuals overnight in jail without

providing interpreters; a jail's failure to provide medical treatment to a person with a disability; state prisons, among other public institutions, lacking telecommunication devices for deaf people; and prisoners with developmental disabilities being subjected to longer terms and abuse by other prisoners. *Id.* at 391-424 (Appendix C to opinion of Breyer, J., dissenting).

In its deliberations on the ADA, Congress also considered the same 1983 U.S. Civil Rights Commission report that had identified persistent abuse of prisoners with disabilities after CRIPA's enactment, as well as reports by other bodies. U.S. Comm'n on C.R., *Accommodating the Spectrum of Individual Abilities* 168 (1983); *see* S. Rep. No. 101-116, at 6 (1989); H.R. Rep. No. 101-485, pt. 2, at 28 (1990). It also highlighted the "[i]nadequate treatment and rehabilitation programs in penal and juvenile facilities." U.S. Comm'n on C.R., *Accommodating the Spectrum of Individual Abilities* 168 (1983).

The voluminous reports, testimony, and other evidence presented to Congress in its ADA deliberations were clear and overwhelming in their conclusions: State agencies routinely violated the constitutional rights of prisoners with disabilities, and those violations were not adequately addressed by existing legislation. Congress passed the ADA after years of incremental and inadequate steps to address the entrenched abuse and neglect of prisoners with disabilities, "including systematic deprivations of fundamental rights." *Lane*, 541 U.S. at 524.

The ADA, then, was Congress's effort to comprehensively address persistent disability discrimination in all areas of life, including in prison administration. "Faced with considerable evidence of the shortcomings of previous legislative responses, Congress was justified in concluding that this difficult and intractable proble[m] warranted added prophylactic measures in response." *Lane*, 541 U.S. at 531 (quotation marks omitted).

**3. Congruence and proportionality.** In light of the well-documented history of states' unconstitutional behavior towards prisoners with disabilities, Title II was a congruent and proportional response. *See Lane*, 541 U.S. at 533. Title II's requirements are modest in comparison to the immense, intractable problem of unconstitutional discrimination against prisoners with disabilities.

To start, Title II's protections extend only to prisoners that meet the definition of a "qualified individual with a disability." 42 U.S.C. § 12132. Prisoners must show that they are "disabled" as defined by the ADA and that they are "qualified" to take part in "services, programs, or activities" provided by a public entity. *Id.*; *cf. Lane*, 541 U.S. at 531-32. Moreover, they must prove that the discrimination was "by reason of" their disability. 42 U.S.C. § 12132. "Title II permits States to limit participation in their programs and activities for all other lawful reasons." *Bowers*, 375 F.4th at 555. That causation requirement means that, when a prisoner with a disability suffers harm that is unrelated to his disability, Title II does not provide relief.

Similarly, Title II does not require prisons to wholly restructure the programs they offer prisoners. A public entity is obligated to accommodate an individual's disability only when the accommodation does not "impose an undue financial or administrative burden … or effect a fundamental alteration in the nature of the service." *Lane*, 541 U.S. at 532 (citing 28 C.F.R. § 35.150(a)(2)-(3)); *see Bowers*, 475 F.3d at 555-56. This reasonableness standard is sensitive to the needs of the prison, and the law does not require a prison to offer any particular service. Rather, Title II mandates only that once a prison decides to provide its prisoners with access to a service, program, or activity, it must be "readily accessible to and usable by individuals with disabilities" "when viewed in its entirety." 28 C.F.R. § 35.150(a). By its own terms, then, Title II regulates only a circumscribed set of government actions.

Moreover, the Prison Litigation Reform Act of 1995 (PLRA) imposes additional limits on incarcerated litigants' access to courts. Prisoners must first exhaust administrative remedies before filing suit. *See* 42 U.S.C. § 1997e(a). If a prisoner brings three federal suits that are dismissed as frivolous, malicious, or for failure to state a claim, the prisoner generally may not file further actions in forma pauperis. 28 U.S.C. § 1915(g).

The PLRA also erects barriers to the regulation of prison conditions. *See* 18 U.S.C. § 3626. A court may not grant relief in an action involving prison conditions unless the relief is "narrowly drawn" and is the "least

intrusive means" required to correct the violation for a specific plaintiff. *Id*. § 3626(a)(1)(A). Courts are also required to give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system" that would result from the requested relief. *Id*. These provisions give states significant control over prison conditions and allow court intervention under Title II (or any other statute or constitutional provision) only in specified circumstances.

Title II's limited impositions on state prison administration are thus an appropriate, modest response to the intractable problem of unconstitutional discrimination against incarcerated people with disabilities. Because all three prongs of the *Lane* test are met, Congress's abrogation of PADOC's Eleventh Amendment immunity is valid, and Lewald's claim should go forward.

## Conclusion

The Court should reverse the district court's grants of dismissal and summary judgment and remand for further proceedings on each of Lewald's claims.

Respectfully submitted,

Samuel Weiss

RIGHTS BEHIND BARS

1800 M Street, NW, FNT 1
  #33821

Washington, D.C. 20033


Kiarra Alleyne*

Lindsey Gradowski*

Galen K. Green*
  Student Counsel

*Motion to authorize student
practice pending

/s/ Becca Steinberg

Becca Steinberg

D.C. Bar No. 1736190

Brian Wolfman

Natasha R. Khan

GEORGETOWN LAW APPELLATE
  COURTS IMMERSION CLINIC

600 New Jersey Ave., NW,
  Suite 312

Washington, D.C. 20001

(202) 662-9549


Counsel for Plaintiff-Appellant
Troy Lewald


March 11, 2026

# Certificate of Compliance

1. I certify that this document complies with Federal Rule of Appellate Procedure 32(g)'s type-volume limitations. In compliance with Rule 32(a)(7)(B), it contains 11,148 words, excluding the parts exempted by Rule 32(f) and Circuit Rule 32(e)(1), and it has been prepared in proportionally spaced typeface using Century Schoolbook, 14-point, in Microsoft Word 2021.

2. I certify that, on March 11, 2026, this brief was filed via CM/ECF. All participants in the case are registered CM/ECF users and will be served electronically via that system. Seven paper copies of this brief will also be filed with the Clerk of this Court.

3. In accordance with Local Rule 28.3(d), I certify that I am a member of the bar of the Third Circuit in good standing.

4. In accordance with Local Rule 31.1(c), I certify that (i) this brief has been scanned for viruses using McAfee LiveSafe and is free of viruses; and (ii) when paper copies are required by this Court, the paper copies will be identical to the electronic version of the brief filed via CM/ECF.

/s/ Becca Steinberg
Becca Steinberg

Counsel for Plaintiff-Appellant
Troy Lewald

# Statutory Addendum

## 29 U.S.C. § 794 - Nondiscrimination under Federal grants and programs

**(a) Promulgation of rules and regulations.** No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978. Copies of any proposed regulation shall be submitted to appropriate authorizing committees of the Congress, and such regulation may take effect no earlier than the thirtieth day after the date on which such regulation is so submitted to such committees.

## 42 U.S.C. § 12132 – Discrimination

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

## 42 U.S.C. § 12202 – State immunity

A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [1] Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

# Addendum

# Table of Contents

## Addendum

Memorandum Opinion (ECF 100) .................................................... Add. 1

Memorandum Opinion (ECF 139) ................................................ Add. 20

Order (ECF 140) ............................................................................ Add. 35

Notice of Appeal (ECF 63) .......................................................... Add. 36

## Separately Bound Joint Appendix

Docket Entries ................................................................................ JA 1

Complaint (ECF 1) .......................................................................... JA 20

Defendants' Motion for Summary Judgment (ECF 130) ................ JA 97

   Exhibit 1: Lewald Deposition (ECF 130-2) ................................ JA 107

   Exhibit 2: Work History (ECF 130-3) ........................................ JA 141

   Exhibit 4: PADOC Policy Statement (ECF 130-5) .................... JA 143

   Exhibit 5: 2017 Inmate Handbook (ECF 130-6) ........................ JA 164

   Exhibit 6: Medical Records (ECF 130-7) .................................. JA 169

   Exhibit 7: Receipt of Inmate Handbook (ECF 130-8) ............... JA 172

Lewald's Motion in Opposition (ECF 135) .................................... JA 175

   A-1: PADOC Policy Statement (ECF 135) ................................ JA 228

   A-2: PADOC Procedures Manual (ECF 135) ............................ JA 249

   A-3: 2017 Inmate Handbook (ECF 135) .................................... JA 266

   A-5: Medical Records User Manual § 2 (ECF 135) .................... JA 279

   A-6: Medical Records User Manual § 3 (ECF 135) .................... JA 305

   A-13: Healthcare Procedures Manual § 17 (ECF 135) .............. JA 316

P-1: Initial Examination (ECF 135-1) ........................................ JA 325

P-2: Feb. 2019 Transfer Exam (ECF 135-1) ............................... JA 331

P-4: May 2019 Transfer Exam (ECF 135-1) ............................... JA 341

P-6: 5/24/19 Medical Progress Note (ECF 135-1) ...................... JA 349

P-8: 12/29/21 Request to Staff (ECF 135-1) .............................. JA 352

P-9: Dec. 2021 Transfer Exam (ECF 135-1) ............................... JA 354

P-10: 1/13/22 Request to Staff (ECF 135-1) ............................... JA 365

P-11: 1/14/22 Grievance (ECF 135-1) ........................................ JA 367

P-12: Sick Call Log (ECF 135-1) ............................................... JA 377

P-14: 2/4/22 Grievance (ECF 135-1) .......................................... JA 380

P-15: 2/7/22 Request to Staff (ECF 135-1) ................................. JA 390

P-16: 2/18/22 Request to Staff (ECF 135-1) ............................... JA 392

P-17: 2/18/22 Grievance No. 1 (ECF 135-1) .............................. JA 394

P-18: 2/18/22 Grievance No. 2 (ECF 135-1) .............................. JA 403

P-19: Release from Work Assignment (ECF 135-1) ................... JA 415

P-20: 2/23/22 Medical Progress Note (ECF 135-1) .................... JA 417

P-21: 2/28/22 Request to Staff (ECF 135-1) ............................... JA 420

P-22: 3/3/22 Medical Progress Note (ECF 135-1) ...................... JA 422

P-23: 3/14/22 Medical Progress Note (ECF 135-1) .................... JA 425

P-24: 3/29/22 Grievance (ECF 135-1) ........................................ JA 429

P-26: 4/22/22 Medical Progress Note (ECF 135-1) .................... JA 442

P-31: Apr. to Aug. 2023 Sick Call Requests (ECF 135-2) .......... JA 445

P-33: 4/14/23 Grievance (ECF 135-2) ........................................ JA 449

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TROY LEWALD, | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT | : | |
| OF CORRECTIONS "PADOC", et al., | : | |
| *Defendants.* | : | NO. 22-cv-04625 |

### MEMORANDUM

KENNEY, J.                                                                                    NOVEMBER 29, 2023

## I.    INTRODUCTION

Plaintiff Troy Lewald, a prisoner proceeding *pro se*, filed a sprawling complaint, launching over a dozen claims against dozens of individual and institutional defendants. Lewald's complaint arises from three central allegations against the defendants: (1) they failed to provide proper medical care; (2) they provided him with a work assignment in prison that he was not physically able to complete; and (3) they improperly reduced his pay rate. Three sets of defendants moved to dismiss the complaint: a set of 36 individuals and the Pennsylvania Department of Corrections (the "Commonwealth Defendants"); four medical professionals and Wellpath LLC (the "Medical Defendants") and Courtney Cione, a mental health professional at the prison.

## II.    BACKGROUND AND PROCEDURAL HISTORY

Lewald was incarcerated at SCI-Phoenix beginning in January 2019. ECF No. 1 ¶ 57. Lewald alleges that he manages a host of medical conditions, including atherosclerosis and degenerative disc disease, as well as posttraumatic stress disorder (PTSD), obsessive compulsive disorder (OCD), manic-depressive disorder, and depression, among other mental health issues. *Id.*

¶ 9. Lewald states that there are several medical restrictions in his file, including that he should not have to lift more than 10 pounds, stand or sit for more than four hours, and that he is only cleared for lite-duty work. *Id.* ¶ 69. However, Lewald claims that these restrictions were deleted from his file, without any notice to him. *Id.* ¶ 80. When transferring facilities, Lewald requested a lite-duty work assignment, citing his medical restrictions. *Id.* ¶¶ 89, 92. However, Lewald was assigned a heavy-duty job in Food Services. *Id.* ¶ 93. Lewald attempted to explain to various prison officials that he should not have been assigned a heavy-duty job, but they did not assist him. *Id.* ¶¶ 94-104. Lewald filed grievances in an attempt to resolve the issue. *Id.* ¶¶ 107-118. Lewald also raised the issue of his medical restrictions with his supervisor in Food Services, Shanda Deshield. *Id.* ¶ 119. Ms. Deshield told Lewald to go back to his housing unit. *Id.* Lewald continued to file grievances and medical sick call requests in an effort to have his medical restrictions reinstated, but to no avail. *Id.* ¶¶ 120-32.

After working in Food Services for approximately a month, Lewald was carrying food trays when he "felt a pop in his back and dropped the stack of trays he was carrying as the pain radiated through his arms, shoulders, and shooting down his sciatic nerve." *Id.* ¶ 133. Lewald requested emergency medical attention, but Ms. Deshield told him to go back to his cell. *Id.* Once back at his cell, Lewald informed a corrections officer, Ms. Grennon, and his unit manager, Ms. Strenkoski, of his injury. *Id.* Neither sent Lewald to receive emergency medical care, and both informed him that he would have to file a sick call. *Id.* Five days later, Lewald was seen by a prison medical official who examined him and prescribed with 600 milligrams of Motrin three times a day, bottom bunk status for six months, and three weeks of no work. *Id.* ¶ 144. Lewald was then released from his Food Services job. *Id.* ¶ 147. Lewald was later seen by Dr. Carol Annino, and told her that he was never "issued" any medication, that he only had a limited amount of 200

2

Add. 2

milligram pills of Motrin, and requested additional diagnostic tests. *Id.* ¶ 154. Dr. Annino responded that Lewald could buy Motrin from commissary. *Id.* Lewald continued to see prison medical officials, with one telling him that she would "fix" the prescription for 600 milligrams of Motrin, prescribed Baclofen, and would look into a medical mattress license. *Id.* ¶ 164. In August 2022, Lewald was reviewing his medical records with a records specialist and saw a line next to his medical restrictions reading "Delete Signoff Approval by Lisa Baird dated 10/20/22." *Id.* ¶ 226.

While addressing his work assignment in Food Services, Lewald also raised several complaints about his pay. On December 2, 2021, Lewald was promoted and was to receive a pay rate of $0.42/hour. *Id.* ¶ 83. However, when Lewald spoke with his unit counselor a few weeks later, he indicated that Lewald's pay rate was only to be $0.38/hour, and he would need to contact Inmate Employment. *Id.* ¶ 88. Lewald filed a request with Inmate Employment and was told that his pay rate was to remain $0.38/hour. *Id.* ¶¶ 89, 91. Lewald then filed grievances complaining that his pay rate was lower than the $0.42/hour he believed he was entitled to. *Id.* ¶¶ 107-08, 155, 168-69, 176. Lewald also complained of charges on his account for medical expenses. *Id.* ¶ 175.

### III.    STANDARD OF REVIEW

In a deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "accept[s] the factual allegations in the complaint as true, draw[s] all reasonable inferences in favor of the plaintiff, and assess[es] whether the complaint and the exhibits attached to it contain enough facts to state a claim to relief that is plausible on its face." *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (internal quotation marks and citations omitted). Nevertheless, the Court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (internal quotation marks and citation omitted). "When presented with a pro se litigant, we

3

Add. 3

have a special obligation to construe his complaint liberally." *Higgs v. Atty. Gen.,* 655 F.3d 333, 339 (3d Cir. 2011) (internal quotation marks and citations omitted).

## IV.    DISCUSSION

A claim under 42 U.S.C. § 1983 is a means "to vindicate violations of federal law committed by state actors." *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002)). The statute "imposes civil liability upon any person who, acting under color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or the laws of the United States." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005) (citation omitted). A § 1983 claim is a vehicle that provides a "remedy for the violation of a federal constitutional or statutory right." *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000).

Civil rights claims under § 1983 can only impose liability on individuals who "played an 'affirmative part' in the alleged misconduct, either through personal direction of or actual knowledge and acquiescence in the deprivation." *Gannaway v. PrimeCare Med., Inc.*, 150 F.Supp.3d 511, 526 (E.D. Pa. 2015) (citing *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986) (additional citation omitted). Such individuals must have "personal involvement" in the violations, which "requires particular allegations of personal direction or of actual knowledge and acquiescence." *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (internal quotation marks and citation omitted). To succeed on a § 1983 claim, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Supervisory authority alone is generally "insufficient to establish the personal involvement necessary" for a § 1983 claim. *Flowers v. Francoise*, No. 22-1077, 2022 WL 2447899, at *2 (3d Cir. July 6, 2022) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207-08 (3d Cir. 1988)). A

municipality's agency or organization, such as the Pennsylvania Department of Corrections ("PADOC"), can be held liable only for a constitutional injury that arose from "execution of a government's policy or custom." *Dixon v. Pa. Dep't of Corr.*, No. 3:17-cv-1827, 2022 WL 3330142, at *7 (M.D. Pa. Aug. 11, 2022) (quoting *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 249 (3d Cir. 2007) (additional citation omitted). A private corporation that contracts with the state to provide services must make a similar showing, that it "established and maintained a policy, practice or custom which directly caused [plaintiff's] constitutional harm." *Dixon*, 2022 WL 3330142, at *8 (citing *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 725 (3d Cir. 1989)). This can be established when "a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict," or where a custom is "so permanent and well-settled as to virtually constitute law." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citations omitted).

Lewald's Complaint boils down to three primary allegations. First, that Defendants mistreated him in ignoring and failing to properly treat his injuries, causing him severe pain. Second, that Defendants deleted work restrictions in his electronic file, that led to him being assigned the Food Services position that exacerbated his injuries. Third, that Defendants improperly reduced his wages.

### a. CONSTITUTIONAL CLAIMS

Lewald fails to plead personal involvement of nearly every defendant in the alleged denial of his constitutional rights. While Lewald lists many names throughout his complaint, he only alleges personal involvement by Dr. Annino and Dr. Baird with regard to his medical treatment.[1] The other individual Defendants are either not named at all in the body of the Complaint, or appear

---

[1] Dr. Annino provided some of Lewald's medical treatment. ECF No. 1 ¶ 154. Dr. Baird is alleged to have deleted the work restrictions in Lewald's electronic file. *Id.* ¶ 226.

Add. 5

sporadically either assisting Lewald or at worst exhibiting impolite behavior.[2] *See, e.g.*, ECF No. 1 ¶ 94 (Defendant Stimmel declining to assist Lewald as outside his scope of responsibility); ¶ 111 (Defendant Delliponti responding to one of Lewald's grievances); ¶ 119 (Defendant Deshield expressing confusion when Lewald told her he is a lite-duty worker and excusing him from work). However, despite Lewald's "alleg[ations] that these defendants had knowledge of his medical treatment because they received and reviewed his medical records and grievances, such actions do not establish personal involvement." *Plummer v. Wellpath*, No. 23-1637, 2023 WL 4181620, at *2 (3d Cir. June 26, 2023). Here, "[o]ther than being named Defendants, there are no specific factual allegations that they had any personal involvement in the purported violations of Plaintiff's constitutional rights under the Eighth Amendment." *Brown v. Wetzel*, No. 13-5469, 2014 WL 5493244, at *3 (E.D. Pa. Oct. 29, 2014). Therefore, all constitutional claims against all individual defendants, other than Drs. Annino and Baird, are dismissed.[3] The constitutional supervisory liability claims against Wellpath and PADOC are similarly dismissed, since Lewald does not allege any policy as to medical treatment or deletion of records that is either an official proclamation or a permanent and well-settled custom, beyond conclusory assertions in his response brief.[4] *See* ECF No. 96 at 26-29. *See also Lewis v. Wetzel*, 153 F. Supp.3d 678, 696 (M.D. Pa. 2015) ("conclusory, vague and speculative allegation[s] of custom, policy or practice are insufficient under *Twombly* and *Iqbal*.").

### i. DELIBERATE INDIFFERENCE

---

[2] Defendant Tara Jackson, who is the subject of several of Lewald's complaints, has been terminated from the case. *See* ECF No. 77.

[3] Given that Defendant Courtney Cione filed a separate motion to dismiss, the Court specifically notes that Lewald failed to plead personal involvement as to Cione

[4] Lewald's Fourth Amendment claim for unreasonable search and seizure fails since he does not allege personal involvement by any Defendants in the seizure of his funds, and for the same reasons discussed here, he does not plead supervisory liability for Wellpath or PADOC.

Although Lewald's constitutional claims against Drs. Annino and Baird survive the initial threshold, in order to survive a motion to dismiss he must make out the substantive elements of each constitutional claim. He does not do so. The Eighth Amendment prohibits prison officials from exhibiting deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) ("This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."). However, "[w]here a prisoner is receiving some amount of medical treatment, we presume that the treatment is adequate absent evidence that it violates professional standards of care." *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023) (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990)). Moreover, since "prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners" it is difficult to establish deliberate indifference where the plaintiff has received any treatment at all. *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)). "Even if the care is inadequate, mere medical negligence or malpractice is not enough to show deliberate indifference." *Anderson*, 2023 WL 5814664, at *2 (citing *Palakovic*, 854 F.3d at 227).

The facts underlying Lewald's deliberate indifference claim are that he suffered a significant back injury while working in Food Services and was not able to obtain a medical appointment for five days. ECF No. 1 ¶ 133. At his appointment, he was prescribed 600 milligrams of Motrin three times a day, bottom bunk status for six months, and three weeks of no work. *Id.* ¶ 144. On March 3, 2022, Lewald again went to a medical appointment and indicated that he had not received the 600 milligrams of Motrin, but rather only 200 milligrams, which was not effective. *Id.* ¶ 154. Eleven days later, Lewald saw another medical provider, who "stated she would help in

Add. 7

any way she could," and "fix[ed] his prescription for 600 milligrams of Motrin, prescribed 10mg of Baclofen, and said she would look into prescribing a medical mattress."[5] *Id.* ¶ 164.

Even drawing all inferences in Lewald's favor, his pleadings only allege that he was prescribed 600 milligrams of Motrin at least twice (as well as other medications), but had difficulty accessing that medication. *Id.* ¶¶ 144, 164. Failing to take medicine that was prescribed does not amount to a claim of deliberate indifference. *See Flowers v. Francoise*, No. 18-13686, 2021 WL 6112285, at *5 (D.N.J. Dec. 27, 2021), *aff'd*, No. 22-1077, 2022 WL 2447899 (3d Cir. July 6, 2022) (granting summary judgment on a deliberate indifference claim where Plaintiff admitted he did not take the medication as prescribed). Lewald saw several medical professionals who prescribed treatment. Even though he requested tests that were not provided, that in itself does not suffice to state a claim of deliberate indifference. *See Anderson*, 2023 WL 5814664, at *4 (finding that denial of a request to see a specialist was only a disagreement with the type of treatment). Lewald's deliberate indifference claim is therefore dismissed.

### ii. EQUAL PROTECTION

Lewald's additional constitutional claims are similarly unavailing. An Equal Protection claim under the Fourteenth Amendment requires demonstrating "the existence of purposeful discrimination." *Shuman*, 422 F.3d at 151. The discrimination must evince "different treatment from that received by other individuals similarly situated." *Kuhar v. Greensburg-Salem Sch. Dist.*, 616 F.2d 676, 677 n.1 (3d Cir. 1980). Lewald has not alleged that any comparators were treated differently than he was, much less intentionally. In fact, the four Declarations attached to the end

---

[5] Lewald also discusses other medical treatment he received, including a yearly exam, renewed prescription for hyperlipidemia medication, and a blood draw. ECF No. 1 ¶ 228. When his blood results indicated hyperthyroidism, he was sent to get an expanded thyroid panel. *Id.* ¶ 232. He continued to see medical providers who analyzed his lab results and prescribed him medication. *Id.* ¶¶ 240, 244.

of Lewald's Complaint suggest that Lewald was actually treated the same as other inmates. ECF No. 1 at 73-76.

### iii. DUE PROCESS

A plaintiff can make a Due Process claim under the Fourteenth Amendment by alleging that the State deprived him of a protected interest in life, liberty, or property, which are "created and their dimensions are defined by an independent source such as state statutes or rules entitling the citizen to certain benefits." *Shuman*, 422 F.3d at 149 (citing *Goss v. Lopez*, 419 U.S. 565, 572-73 (1975) (internal quotation marks and additional citation omitted). Lewald has not pointed to any basis for asserting that he has a protected interest in his work assignment or a particular pay rate, since "inmates have no right to a particular job assignment while they are incarcerated." *Williams v. Fed. Bureau of Prisons and Parole Comm'n*, 85 F. App'x 299, 305 (3d Cir. 2004) (citing *James v. Quinlan*, 866 F.2d 627, 630 (3d Cir. 1989)). Nor has Lewald asserted a property or liberty interest in the work restrictions in his file.

Moreover, Lewald had access to substantial process to redress his grievances. He spoke to several PADOC employees about his concerns (ECF No. 1 ¶¶ 88, 98, 129), filed numerous grievances (*see e.g.*, *id.* ¶¶ 102, 107-08, 115-18, 120), and appealed many denials of those grievances (*id.* ¶¶ 126, 148-49, 156-57, 162, 168-69, 174, 180, 182, 189, 194-95, 209-10, 214, 217). The existence of a prison grievance system provides a post-deprivation remedial process sufficient to pass constitutional muster. *See Tillman v. Lebanon Cty. Corr. Facility*, 221 F.3d 410, 422 (3d Cir. 2000). Lewald's Equal Protection claim is dismissed.

### b. RETALIATION

Lewald next alleges that prison officials retaliated against him for filing grievances. In order to state a First Amendment retaliation claim, a plaintiff must show that the conduct leading

9

Add. 9

to the alleged retaliation was constitutionally protected, he suffered adverse action at the hands of the prison officials, and there was a causal link between exercise of constitutional rights and adverse action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). Plaintiff has the initial burden to prove that constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him. *Id.* The elements for an Americans with Disabilities Act ("ADA") retaliation claim are similar. *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000).

According to Lewald's Complaint, the retaliation came in the form of a heavy-duty job assignment and reductions in his pay. ECF No. 1 at 64. However, Lewald has not alleged a sufficient causal connection between his grievances and the alleged retaliation. Most critically, Lewald first filed a grievance *after* his pay reduction and job assignment change had already occurred. Lewald first reports a reduction in pay on December 29, 2021. ECF No. 1 ¶ 88. He received his job assignment in Food Services on January 6, 2022. *Id.* ¶ 93. However, he did not file his first grievance until January 14, 2022. *Id.* ¶ 96. It is illogical for Lewald to claim retaliation when the alleged retaliation took place *before* the adverse action. It is more illogical given that Lewald's grievances were partially successful. On February 25, 2022, just over a month after filing his first grievance and a week after his injury, Lewald was released from his Food Services job. *Id.* ¶ 147. Aside from temporal proximity, Lewald has not alleged any facts suggesting that his pay reduction came as a result of filing further grievances. In fact, prison officials explained to Lewald why his pay had been reduced. *Id.* ¶¶ 184, 205. Prison officials responded to Lewald's requests for information and explained that his pay was reduced when he was on medical leave and no longer working. *Id.* After Lewald had already filed numerous grievances, he was informed that once he was working again, his pay would be increased back to $0.38/hour. *Id.* ¶ 205.

**c. AMERICANS WITH DISABILITIES ACT/REHABILITATION ACT**

10

Add. 10

Lewald also asserts ADA and RA claims. The relevant provision of the ADA states "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity,[6] or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a claim under the ADA, "plaintiffs must demonstrate that: (1) they are qualified individuals; (2) with a disability; and (3) they were excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or were subjected to discrimination by any such entity; (4) by reason of their disability." *Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023). When the plaintiff is seeking compensatory damages, the "plaintiff must also show intentional discrimination under a deliberate indifference standard." *Id.*

"With limited exceptions, the same legal principles govern ADA and RA claims." *CG v. Pa. Dep't of Edu.*, 734 F.3d 229, 235 (3d Cir. 2013). The RA provides "[n]o otherwise qualified individual with a disability[7] . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). To make out a claim under the RA, the Plaintiff has to show the same elements as under the ADA but must also prove that the program in question received federal funding.[8] *CG*, 734 F.3d at 235 n.10. Additionally, there is variation in the causation requirement. Under the ADA, a "but-for causation" is needed, while the RA requires the plaintiff to show that disability is the "sole cause" of the discrimination. *Durham*, 82 F.4th at 226. "Refusing to make reasonable accommodations is tantamount to denying access."

---

[6] The Supreme Court has held that state prisons are considered a "public entity." *United States v. Georgia*, 546 U.S. 151 (2006) (citing *Pa. Dep't of Corrections v. Yesky*, 524 U.S. 206, 2010 (1998)).

[7] The Act defines an individual with a disability as any individual who (1) "has a physical or mental impairment which for such individual constitutes or results in substantial impediment to employment"; (2) "can benefit in terms of an employment outcome from vocational rehabilitation services"; (3) "any person who has a disability as defined in section 3 of the Americans with Disabilities Act of 1990." 29 U.S.C. § 705(20).

[8] Prisons receive federal dollars, so we find this element met.

Add. 11

*Id.* To make out a money damages claim, plaintiff must allege intentional discrimination, which requires a showing of deliberate indifference. *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019). That showing is made by alleging that (1) Defendant "had knowledge that a federally protected right is substantially likely to be violated," and (2) Defendant "failed to act despite that knowledge." *Id.* at 292.

As a threshold matter, only particular entities are the proper subjects of ADA or RA claims. State officials sued in their individual capacities cannot be sued under Title II of the ADA or the RA. *See Sides v. Wetzel*, No. 2:20-cv-1168, 2021 WL 8017811, at *13 (W.D. Pa. Nov. 2, 2021) (citing *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002); *Matthews v. Dep't of Corr.*, 613 F. App'x 163, 170 (3d Cir. 2015)). Nor can "private corporations" that "contract[] with a public entity to provide some service," since "a private corporation is not a public entity merely because it contracts with a public entity to provide some service." *Matthews*, 613 F. App'x at 170 (internal quotation marks and citations omitted). Additionally, ADA lawsuits against state entities are barred by sovereign immunity, except where a plaintiff successfully alleges constitutional violations. *Durham*, 82 F.4th at 228-29. Last, sovereign immunity does not bar suit against state entities under the Rehabilitation Act. *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 172 (3d Cir. 2002) (quoting *Lane v. Pena*, 518 U.S. 187, 200 (1996) ("The Supreme Court has recognized § 504 [of the Rehabilitation Act] . . . to be 'an unambiguous waiver of the State's Eleventh Amendment immunity.'")).

With this background, all ADA and RA claims against the defendants in their individual capacities are dismissed. The ADA claim against Wellpath is dismissed since Wellpath is precisely the type of private corporation that the Third Circuit deemed an inappropriate subject for a Title II ADA lawsuit in *Matthews*. 613 F. App'x at 170. Lewald does not allege that Wellpath receives

federal funding and Wellpath denies receiving federal funds, and therefore, Lewald's RA claim against Wellpath is misplaced and must be dismissed. *See* ECF No. 41 at 27 n.6. As discussed previously, Lewald does not sufficiently allege any constitutional claims, so his ADA claim against PADOC for money damages must be dismissed as well.

Lewald's ADA claim against PADOC for injunctive relief is not barred for this reason, but is barred because it is moot and no longer a live controversy. A claim is moot where it fails to "present live disputes, ones in which both sides have a personal stake." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020). When the claim becomes moot as a result of "voluntary cessation of the challenged action," courts are more reluctant to dismiss them. *Id.* at 306-07. However, "we are generally less skeptical of voluntary cessation claims where the change in behavior was unrelated to the relevant litigation." *Clark v. Governor of N.J.*, 53 F.4th 769, 778 (3d Cir. 2022)*; see also Cnty. of Butler v. Governor of Pa.*, 8 F.4th 226, 230 (3d Cir. 2021) ("the voluntary cessation doctrine does not apply here because [the cessation was not] a response to the litigation."). Lewald's Complaint indicates that his work restrictions were eventually restored before he filed the lawsuit. *See* ECF No. 1 ¶ 235. A prison official showed Lewald the restrictions and explained how Lewald can ensure that they are renewed. *Id.* Since the challenged conduct was corrected by prison officials before the lawsuit was filed, there is nothing to enjoin.

Moreover, Lewald's claim for injunctive relief is overly vague about the precise form of injunctive relief he seeks, which is itself sufficient to deny a request for an injunction. *See Black Horse Lane Assoc., L.P. v. Dow Chemical Corp.*, 228 F.3d 275, 291 n.11 (3d Cir. 2000) (denying injunctive relief where "appellants' vague assertion that injunctive relief is appropriate in this case, without any further elaboration on that point, is unconvincing."). Especially since Lewald's work restrictions have since been restored in his file, there is no clear form of injunctive relief that can

Add. 13

be ascertained from his Complaint. Nor does Lewald's Response shed any additional light on this issue. *See* ECF No. 96 at 15-19. Because it is not clear what injunctive relief would remain and there is no longer any challenged conduct occurring, Lewald's claims for injunctive relief are dismissed.

Notwithstanding the denial of his ADA claims, there are no bars to Lewald's RA claim against PADOC. On the substantive elements, PADOC does not dispute that Lewald has a disability. ECF No. 86 at 15. However, PADOC asserts that Lewald was not a victim of intentional disability discrimination and that his work assignment falls outside the scope of the RA. *Id.*

Program or activity takes on a broad meaning under the RA and includes "'*all* of the operations of' a state instrumentality." *Furgess*, 933 F.3d at 289 (citing 29 U.S.C. § 794(b)). The meaning of "program or activity" under the RA is "'extremely broad in scope and includes anything a public entity does.'" *Id.* (quoting *Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.,* 796 F.3d 293, 301 (3d Cir. 2015)). Therefore, these terms are "all-encompassing." *Furgess*, 933 F.3d at 289 (citing *Yeskey*, 118 F.3d 168, 170 (3d Cir. 1997), *aff'd sub nom.* 524 U.S. 206 (1998)). Moreover, "a prison's refusal to accommodate inmates' disabilities in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constitutes a denial of the benefits of a prison's services, programs, or activities under Title II." *Furgess*, 933 F.3d at 290 (internal quotation marks and citation omitted).

Here, Plaintiff was assigned to work in Food Services, a heavy-duty assignment. ECF No. 1 ¶ 93. The same day he received this assignment, Plaintiff informed numerous officials that he had a disability and could not perform these duties, beginning with his Unit Counselor Jason Stimmel. *Id.* ¶ 94. Lewald then raised the issue with Melissa Delliponti, who worked in Inmate Employment, spoke with Unit Sergeant Mr. Garmin and Unit Corrections Officer Ms. Stubbs, and

filed a grievance. *Id.* ¶¶ 95-96. Upon reporting to work, Lewald explained his disability to Food Services Supervisor Robert Choate, Food Services Instructor Shanda Deshield, and Unit Manager Lisa Durant. ¶¶ 97-98. Lewald then filed two Medical Sick Call Requests resulting in an appointment with Tara Jackson, whom Lewald says did not examine him. ¶¶ 99, 103-04. Over the course of the next few weeks, Lewald continued to file grievances, make Medical Sick Call Requests, and attempt to explain his disability to his supervisors in Food Services. *Id.* ¶¶ 104-32. Viewing Lewald's Complaint in the light most favorable to him, no prison official took any action to address his concerns with performing heavy-duty work. Lewald continued to report to his job in Food Services until he suffered an injury that caused him to "scream[] in pain." *Id.* ¶ 133.

"Refusing to make reasonable accommodations is tantamount to denying access." *Durham*, 82 F.4th at 226. Here, reasonable accommodations were not made for Plaintiff and Plaintiff was effectively forced to work in dangerous conditions given his disability. In *Durham*, the Third Circuit found the causation elements in the RA were met where requests for accommodation were repeatedly refused and complaints of pain ignored which prevented plaintiff from utilizing a service, program, or activity. *Id.*

In *Durham*, the court determined that plaintiff pleaded sufficient facts to demonstrate intentional discrimination under the deliberate indifference standard when the defendants had "knowledge that a federally protected right – his right under the ADA to be free from disability discrimination – was substantially likely to be violated." *Id.* The court noted that plaintiff made prison officials aware that he needed a cane and was in pain without it, and he was continuously denied his cane and accommodations. *Id.* "This alone was sufficient to allege a deliberate indifference claim." *Id.* Similarly, here, Plaintiff repeatedly told various prison officials, medical

providers, and filed grievances regarding his disability and the lack of accommodation.[9] Plaintiff's efforts were sufficient to have provided Defendants with knowledge of his disability and need for accommodation; however, despite this knowledge, there was no action to accommodate Plaintiff's disability. Thus, Plaintiff has sufficiently pleaded an RA claim seeking compensatory damages.

### d.  STATE CLAIMS

Because Plaintiff has properly pleaded a federal claim, this Court retains supplemental jurisdiction over Lewald's state law claims. 28 U.S.C. §1367(a). However, each of the state claims are dismissed.

Under Pennsylvania law, "the Commonwealth, its agencies and employees enjoy broad immunity from most state-law tort claims." *Boucher v. Lupacchini*, No. 3:19-CV-2106, 2021 WL 11096471, at *9 (M.D. Pa. Mar. 1, 2021). Officials and employees are entitled to immunity when "acting within their scope of their duties." *Id.* (citing *Moore*, 538 A.2d at 115). An employee's conduct is within the scope of their duties if "it is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated, at least in part, by a purpose to serve the employer . . ." *Id.* (citations omitted). Pennsylvania law also applies sovereign immunity when the Commonwealth is sued for allegedly inflicting an intentional tort. *See Luck v. Asbury*, No. 3:12-cv-0087, 2013 WL 433536, at *4 (M.D. Pa. Feb. 5, 2013) (collecting cases finding that assault, battery, and intentional infliction of emotional distress were intentional torts barred by sovereign immunity). Pennsylvania also

---

[9] In addition, Plaintiff alleges that prior to his transfer there were restrictions noted in SAPPHIRE including: "no lifting more than 10 pounds, no standing/sitting more than 4 hours, no impact jobs/sports, no jumping/climbing, no excessive bending, bottom-bunk, lite-duty work assignment, no food service-handle/janitor, NOT MEDICALLY CLEARED FOR FOOD SERVICES." *Id.* at ¶ 69. Officials claim they could not access or view this information. However, when Plaintiff met with a records specialist he was quickly able to view Plaintiff's medical record which included a record of his disability and accommodations that Plaintiff received as the previous facility.

Add. 16

statutorily recognizes nine exceptions to sovereign immunity.[10] The only exception relevant to any of Lewald's state claims is for medical-professional liability, which the Court will address separately. Thus, sovereign immunity bars almost all of Plaintiff's tort claims against all Defendants.[11]

To succeed on a claim of medical malpractice, a plaintiff must comply with Pennsylvania Rule of Civil Procedure 1042.3, which requires a Plaintiff bringing a claim of medical malpractice to file a certificate of merit within 60 days after filing the complaint. Pa. R. Civ. P. 1042.3(a). The certificate must attest to the colorable merit of the claim by including one of the following statements:

> (1) that 'an appropriate licensed professional' has supplied a written statement that there is a reasonable probability that the defendant's conduct fell outside acceptable professional standards; (2) that the claim against the defendant is based solely on allegations against other professionals for whom the defendant is responsible; or (3) that expert testimony is unnecessary for prosecution of the claim.

*Perez v. Griffin*, 304 F. App'x 72, 74 (3d Cir. 2008) (citing Pa. R. Civ. P. 1042.3). Rule 1042.3(a) states that a *pro se* plaintiff must file a certificate of merit. Failure to file the certificate of merit is fatal to the claim unless plaintiff demonstrates that the failure to comply is justified by a "reasonable excuse." *Perez*, 304 F. App'x at 74 (citing *Womer v. Hilliker*, 908 A.2d 269, 279-80 (Pa. 2006)).

Here, Plaintiff submitted two certificates of merit. ECF Nos. 87, 94. However, neither comply with the requirements of the Pennsylvania law. Both certificates are untimely, as they were filed on September 21, 2023 and October 29, 2023, respectively, whereas the Complaint was filed

---

[10] Exceptions include (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody and control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa.C.S. § 8522(b).

[11] The claims barred by sovereign immunity include: negligence, neglect of a care dependent person, assault and battery, intentional infliction of emotional distress, embezzlement, misapplication of property, and financial exploitation of a care-dependent person.

17

on November 11, 2022. *See* ECF Nos. 1, 87, 94. Moreover, neither were written by "an appropriate licensed professional." Pa. R. Civ. P. 1042.3(a)(1). Plaintiff himself wrote and signed both certificates. ECF Nos. 87, 94. Plaintiff has not alleged that he is a licensed medical professional of any kind. Therefore, the certificate of merit requirements are not met and the medical malpractice claim cannot stand.

Finally, Lewald cannot bring claims under the Protection and Advocacy for Mentally Ill Individuals Act ("PAMII") or the Pennsylvania Human Relations Act ("PHRA"). The PAMII does not contain a private right of action, and therefore, Lewald cannot bring a claim under that statute. *See N.A.M.I. v. Essex Cty. Bd. of Freeholders*, 91 F.Supp.2d 781, 787 (D.N.J. 2000) (dismissing complaint "since neither enforceable rights and duties nor a private right of action are created by" the PAMII).

Pennsylvania law requires plaintiffs "to exhaust administrative remedies under the PHRA before filing a civil action." *Hudnell v. Thomas Jefferson Univ. Hosps., Inc.*, 537 F.Supp.3d 852, 858 (E.D. Pa. 2020). These administrative remedies require the plaintiff to file a complaint with the Pennsylvania Human Relations Commission (PHRC) (or a similar agency such as the EEOC or Philadelphia Commission on Human Relations). *Id.* Once a plaintiff files with the agency, "the PHRC has exclusive jurisdiction over the claim for one year. . . . A complainant may not file a lawsuit during that period." *Id.* Lewald has alleged in a conclusory fashion that he "exhausted his administrative remedies prior to filing this complaint." ECF No. 1 ¶ 56-A. Under *Twombly*, this is a conclusory assertion that the Court is not required to credit unless supported by plausible factual material. *See Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 554-55) ("[T[he allegations are conclusory and not entitled to be assumed true."). Lewald has not alleged that he filed with the PHRC or an equivalent agency. Circumstantially, the Court notes that the bulk of the allegations

in Lewald's complaint occurred in the first half of 2022, and his complaint was filed in November 2022, making it evidently impossible that Lewald waited for the PHRC's one-year period of exclusive jurisdiction to elapse before filing his complaint. *See generally*, ECF No. 1.

### V. CONCLUSION

For the foregoing reasons, Defendant Cione's Motion to Dismiss (ECF Nos. 50, 51) is **GRANTED** in full. The Medical Defendants' Motion to Dismiss (ECF Nos. 40, 41) is **GRANTED** in full. The Commonwealth Defendants' Motion to Dismiss (ECF No. 86) is **GRANTED IN PART AND DENIED IN PART.** The Commonwealth Defendants' Motion (ECF No. 86) is **DENIED** as to Lewald's Rehabilitation Act claim against PADOC; the motion is **GRANTED** as to all other claims against all other defendants.

Aside from Lewald's Rehabilitation Act claim against PADOC, all other claims against all other Defendants are dismissed without prejudice for Lewald to file an Amended Complaint by **January 16, 2024.** If no Amended Complaint is filed by that date, the Court will consider those claims dismissed with prejudice.

All other pending motions filed by Lewald (ECF Nos. 85, 93, 95, and 97) are **DENIED AS MOOT.** An appropriate order follows.

                                         **BY THE COURT:**

                                         **/s/ Chad F. Kenney**

                                         _____

                                         **CHAD F. KENNEY, JUDGE**

Add. 19

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TROY LEWALD, | : | CIVIL ACTION |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT | : | |
| OF CORRECTIONS "PADOC", | : | |
| *Defendant.* | : | NO. 22-cv-04625 |

MEMORANDUM

KENNEY, J.                                                                                  June 3, 2025

## I.   INTRODUCTION

Plaintiff Troy Lewald ("Lewald" or "Plaintiff"), proceeding *pro se*, filed a sprawling complaint asserting over a dozen claims against dozens of defendants. ECF No. 1. On November 23, 2023, the Court dismissed all claims except a claim against the Pennsylvania Department of Corrections ("Defendant" or "PADOC") under 29 U.S.C. § 794(a) (the "Rehabilitation Act"). ECF No. 101.

Before the Court is Defendant's Motion for Summary Judgement on the final remaining claim. ECF No. 130. Following the close of discovery, Defendant moved for summary judgement arguing Plaintiff failed to meet his burden of proof as a matter of law under the Rehabilitation Act. ECF No. 130 at 7. Plaintiff filed a response and objections to Defendant's Motion. ECF Nos. 135–36. Plaintiff's claim under the Rehabilitation Act fails as a matter of law because he has failed to provide evidence that his disability was the sole cause of his denial of requested work accommodations or his work placement ("discriminatory action"), discussed below. Accordingly, the Court will grant the Defendant's Motion.

## II.  BACKGROUND

Lewald was first incarcerated at SCI-Phoenix in January 2019. ECF No. 1 ¶ 57. Lewald alleges he has a "documented history of atherosclerosis . . . and degenerative disc disease . . . and has been regarded as disabled since his initial commitment the PADOC." ECF No. 1 ¶ 9. Lewald had surgery in 2015 to repair a herniated disc and several discs are on watch for suspected herniation. *Id.*; ECF No. 130-2 at 14:3–4. Lewald's "DC-440 Initial Examination" dated January 25, 2019, states his diagnosis is "chronic back pain" and that he has limited range of motion of his spine. ECF No. 135-1 at 68–71. The Initial Examination includes his past medical history of herniated discs and past surgical history of removing fragments of discs. *Id.* at 70. Lewald does not have any assistive devices on file for his back pain. ECF No. 130-7 at 3.

At various times during Lewald's incarceration, Lewald had medical housing recommendations, activity restrictions, and employment restrictions entered onto his file. ECF No. 1 ¶¶ 58, 67; ECF No. 130-7 at 3. A large tranche of these recommendations and restrictions were entered on May 24, 2019, and included the following employment restrictions: "no food service-handle/janitor," "no high risk of injury," "no intensive labor," and "no lifting." ECF No. 130-7 at 3.

Lewald claims his restrictions were deleted from his file without any notice to him on October 6, 2021. *Id.* ¶ 80. Lewald's "Inmate Medical Status; Restrictions and Other Needs Report" ("Restrictions Report") shows that all his recommendations and restrictions in effect at that time ended on October 6, 2021. ECF No. 130-7 at 2–3. The recommendations and restrictions that ended included his lower bunk housing recommendation; his "no weightlifting" and "non-contact sports only" activity restrictions; and his "no high risk of injury," "no intensive labor," and "no lifting" employment restrictions. *Id.* However, Lewald's "no food service-handle/janitor" employment restriction ended almost a year prior on October 20, 2020. *Id.* at 3. The "Patient Activity

2

Add. 21

Restrictions History Report" ("<u>Patient History Report</u>") also shows under "Employment Restrictions" that the "no food service-handle/janitor" restriction ended on October 20, 2020. ECF No. 135-2 at 142. The Patient History Report does include two entries of "Not Medically Cleared for Food Service" under "Medical Status Summary" that ended on October 6, 2021. *Id.* at 138.

After time in other facilities, *see* ECF No. 130-2 at 34:9–17, Lewald was transferred back to SCI-Phoenix on December 28, 2021, ECF No. 135 at 15. When returning to SCI-Phoenix, Lewald requested a lite-duty work assignment, specifically a block tutor position, citing his medical restrictions. ECF No. 1 ¶¶ 89, 92; *see* ECF No. 135-1 at 104. However, Lewald was assigned a job in Food Services. *Id.* ¶ 93; *see* ECF No. 135-1 at 119. Lewald attempted to explain to various prison officials that he should not have been assigned a heavy-duty job. ECF No. 1 ¶¶ 94–104; ECF No. 130 at 4 ¶ 4. Lewald filed grievances and inmate requests attempting to resolve the issue. ECF No. 1 ¶¶ 107–118; *see e.g.* ECF No. 135-1 at 119, 135, 145. Lewald raised the issue of his medical restrictions with his supervisor in Food Services. *Id.* ¶ 119; ECF No. 135-1 at 135. Lewald also filed medical sick call requests in an effort to have his medical restrictions reinstated. *Id.* ¶¶ 120–32; *see* ECF No. 135-1 at 129.

On January 25, 2022, Lewald was seen by medical services and raised the issue of restrictions to a Medical Assistant, Ms. Jackson. ECF No. 1 ¶ 104; ECF No. 135-1 at 132–133. Lewald claims the Medical Assistant told him that his file did not have restrictions, did not examine Lewald, and told Lewald it was his responsibility to transfer any previous restrictions from his last institution. ECF No. 1 ¶ 104. Two days later, Lewald wrote to the Superintendent of Centralized Services at SCI-Phoenix seeking assistance in transferring his restrictions. *Id.* ¶ 110. Lewald was seen again by the Medical Assistant on February 15, 2022, when he again raised his concerns. *Id.* ¶ 131; *see* ECF No. 135-1 at 156. On this date, work restrictions were entered on Lewald's file

Add. 22

including "no high risk of injury," "no intensive labor," "no lifting more than 15 pounds," and "no work at heights/elevations." ECF No. 130-7 at 3. No restriction on kitchen work was added. *See id.*

On February 18, 2022, after working in Food Services for approximately one month, Lewald was carrying food trays when he "felt a pop in his back and dropped the stack of trays he was carrying as the pain radiated through his arms, shoulders, and shooting down his sciatic nerve." ECF No. 1 ¶ 133. Lewald requested emergency medical attention, but his supervisor told him to go back to his cell. *Id.* Once back at his cell, Lewald informed a corrections officer and his unit manager of his injury. *Id.* Neither sent Lewald to receive emergency medical care since it did not "look like an emergency" and both informed him that he would have to file a sick call. *Id.* That day, Lewald filed a sick call, *id.* ¶ 136, and filed multiple inmate requests and grievances, *id.* ¶¶ 134–138; *see* ECF No. 135-1 at 147, 149, 158.

Five days later, Lewald was seen by a prison medical official who examined him and prescribed him 600 milligrams of Motrin three times a day, bottom bunk status for six months, and three weeks of no work. ECF No. 1 ¶ 144; ECF No. 130-4. Lewald was then released from his Food Services job. ECF No. 1 ¶ 147; ECF No. 135-1 at 170.

After this incident, Lewald filed a DC-ADM 006 Reasonable Accommodations for Inmates with Disabilities form for supplemental bedding in April of 2022. ECF No. 130-2 at 17:7–19:17. At no other time did he complete this form. *Id.* Since the incident, Lewald has continued to file grievances, requests to staff members, and sick call requests regarding his pay, work assignments, and other complaints. *See generally* ECF No. 130-1 at 175–130-2 at 220.

Lewald filed his Complaint in this Court on November 16, 2022. ECF No. 1. The Court dismissed all claims except Lewald's Rehabilitation Act claim against the Defendant. ECF Nos.

100, 101. After the close of discovery, Defendant filed a Motion for Summary Judgment. ECF No. 130. Defendant's Motion included a recitation of material facts as well as a transcript of the deposition of Troy Lewald, Lewald's work assignments, Lewald's "DC-472 Progress Note Medical Provider" dated February 23, 2022, Lewald's Restriction Report, and copies of inmate handbooks and forms. ECF No. 130 at 1–3; ECF Nos. 130-2–130-8. Plaintiff's "Motion in Opposition to Motion for Summary Judgment" (ECF No. 135, "<u>Response</u>"), provides various handbooks and policies, *see* ECF 135-1 at 1–63, a more complete collection of his medical file before and after the incident, *see e.g. id.* at 68–102, 105–115, 131–133, copies of many of his requests and grievances before and after the incident, *see e.g. id.* at 104, 119, 135, 145, 218, among other documents, *see generally* ECF No. 135.

## III. STANDARD OF REVIEW

A court may enter summary judgement when there exists "no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. 56(a). A court must "examine the evidence of record in the light most favorable to the party opposing summary judgement and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However, the non-movant must not "rely merely upon bare assertions, conclusory allegations, or suspicions." *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Instead, the non-movant "must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000).

The initial burden is on the movant for summary judgment to show the absence of a genuine issue of material fact. "'[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving

party's case' when the nonmoving party bears the ultimate burden of proof." *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir.2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). The plaintiff "must point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995) (citing *Celotex*, 477 U.S. at 322). The "[plaintiff] must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249.

## IV.    DISCUSSION

The Rehabilitation Act provides "[n]o otherwise qualified individual with a disability. . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Therefore, Lewald must demonstrate that the program in question received federal dollars and: (1) he is a qualified individual; (2) with a disability; (3) was excluded from participation in or denied the benefits of a program or activity of a public entity, or discriminated against by that entity; (4) by reason of his disability. *See id.*; *Durham v. Kelley*, 82 F. 4th 217, 225 (3d Cir. 2023). Finally, "refusing to make reasonable accommodations is tantamount to denying access." *Id.* at 226.

"Congress has directed the courts to construe the [Americans with Disabilities Act ("ADA")] and the Rehabilitation Act such that conflicting standards do not arise, *see Bragdon v. Abbott,* 524 U.S. 624 (1998), [but] the ADA and the Rehabilitation Act are not exactly the same."

*New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 n.4 (3d Cir. 2007). The causation element of the Rehabilitation Act and the ADA differ. *Durham,* 82 F. 4th at 226. The Rehabilitation Act requires that discriminatory action be "**solely** by reason of her or his disability." 29 U.S.C. § 794(a) (emphasis added). The ADA, by contrast, only requires that it be "by reason of such disability." 42 U.S.C. § 12132. An alternative cause of why a plaintiff was treated differently is fatal to a claim under the Rehabilitation Act "because disability would no longer be the sole cause." *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013).

Here, the requirement that PADOC receive federal funds and the first two elements of a Rehabilitation Act claim are met or not disputed for the purposes of this Motion. The Court previously found that the state prison receives federal dollars, *Id.* at 11 n.8, and that Plaintiff's work assignment qualifies as a "program or activity" within the meaning of the Rehabilitation Act, ECF No. 100 at 14. Defendant does not dispute that Plaintiff is a qualified individual with a disability for the purposes of this Motion. ECF No. 130 at 8.

The third element—that Lewald was excluded from participation in or denied the benefits of a program or activity of a public entity, or discriminated against by that entity—is disputed by the Defendant. Lewald alleges he was denied his requested work accommodation and was placed in an inappropriate work assignment which led to an accident at work. ECF No. 1 ¶ 88–133 The incident at issue involved a "pop" in his back, and Plaintiff was subsequently released from food services. ECF No. 1 ¶ 133; ECF No. 135-1 at 170. Here, Lewald is using the Rehabilitation Act to *avoid* a work assignment rather than the Defendant excluding him from work—the focus of the Rehabilitation Act. In addition, Plaintiff did not seek or want a reasonable accommodation to work the food services role he was assigned; rather, he only wanted to work as a block tutor. Defendant describes its behavior as only "alleged non-responsiveness" but provides little argument on this

Add. 26

element. *See* ECF No. 130 at 8-9. The Court need not focus on the disputes of this element since the causation requirement of the fourth element is dispositive.

The fourth element is clearly not met. Plaintiff has failed to allege or provide evidence that his disability was the **sole cause** of his denial of work accommodations and his work placement, as discussed below. Since Plaintiff has failed to provide evidence of the sole cause requirement, no trier of fact could find a violation of the Rehabilitation Act. Accordingly, the Court will grant PADOC's Motion for Summary Judgment.

### A. Lewald's burden as Plaintiff

As Plaintiff, Lewald must make out a prima facie case of discrimination and bears the burden of demonstrating the elements a Rehabilitation Act claim. *See e.g. Shiring v. Runyon,* 90 F.3d 827, 831 (3d Cir. 1996). Lewald "must point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti,* 71 F.3d at 484. Lewald must provide evidence that his disability is the sole cause of the discriminatory action.

Defendant in its Motion points to Plaintiff's filings and argues that he has not "alleged or remotely inferred, that he was denied his requested work accommodation because of his disability." *Id.* at 6. "At most, Lewald has alleged that there was an oversight within PADOC for not notifying Lewald that his work restriction expired in 2020 or for not automatically implementing his improperly requested employment restriction." *Id.* Defendant highlights that Plaintiff Lewald failed to comply with PADOC policy by not requesting a disability accommodation through the proper procedure. ECF No. 130 at 6–7. Additionally, Defendant points to Lewald's deposition, arguing it shows Lewald believed his Food Service placement was not motivated by his disability, but was "either random or out of convenience, but not because of his disability." *Id.* at 7.

Add. 27

The Court agrees that Plaintiff has not provided evidence to show his disability was the sole cause of the discriminatory action, as required by the Rehabilitation Act. Since PADOC pointed to the absence of evidence to support an element of a Rehabilitation Act claim, Lewald "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record…; or (B) showing that the materials [the movant] cited do not establish the absence…of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

## B. The record does not show that Lewald's disability was the sole cause of the discriminatory action

Plaintiff's Complaint does not allege that his disability was the sole cause of the alleged discriminatory action, as required by the fourth element of the Rehabilitation Act. Since Plaintiff is proceeding *pro se*, the Court will construe his pleadings liberally and look to the record to see if there is evidence that his disability was the sole cause of the alleged discriminatory action by PADOC. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (explaining that "[a] document filed *pro se* is to be liberally construed") (citation and quotation marks omitted).

Lewald filed a response and objections to the Motion.[1] ECF Nos. 135, 136. In his Response, Lewald provides manuals, medical records, transfer records, inmate requests, inmate grievances,

---

[1]    Lewald objects to the inclusion of ECF No 130-7 (Exhibit 6) in the record. *See* ECF No. 136. Rule 56(c)(2) provides that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

    Exhibit 6 is a printout of Plaintiff's Restrictions Report that describes Plaintiff's medical clearance, housing recommendations, activity restrictions, employment restrictions, and assistive devices. *See* ECF No. 130-7. The Restrictions Report can be presented in a form that is admissible as a Business Record under Federal Rule of Evidence ("<u>FRE</u>") 803(6) and can easily be authenticated under FRE 901. The Restrictions Report, a summary of the employment restrictions Lewald had on his file leading up to the incident, is highly relevant and not unduly prejudicial, confusing or misleading under FRE 403.

    Lewald argues his Patient History Report, ECF No. 135-2 at 137-144, should be used instead as the "best evidence," ECF No. 136 ¶ 7. FRE 1002, sometimes called the "best evidence rule," is a narrow mandate to produce the original document. *United States v. Miller*, 248 F. App'x 426, 429 (3d Cir. 2007). Lewald does not object to the Report being a copy but rather that he would prefer the Patient History Report be used instead. ECF No. 136 ¶ 7.

    Since the Restrictions Report can be presented in a form that would be admissible at trial and it is relevant and not unduly prejudicial, the Restrictions Report can be used at this stage. Further, the Patient Restrictions Report— the document Lewald argues should be used instead, also shows that his "No food service-handle/janitor" employment restriction ended on October 20, 2020, discussed above in Section II. Background. ECF No. 135-2 at 142. The Patient

and other documents from the time leading up to his transfer to SCI-Phoenix, his time at SCI-Phoenix prior to the incident, the incident itself, and his treatment thereafter.[2] *See* ECF No. 135. None of the restriction reports, medical records, conversations with staff, or documents submitted to the Defendant on the record show that his disability was the sole cause of the denial of his requested work accommodation or work placement. A trier of fact could not find that Lewald is entitled to relief under the Rehabilitation Act because he has not put forward evidence to meet the "sole cause" requirement of the Rehabilitation Act. The Court discusses the record below, focusing first on the documents prepared by others and then to the efforts taken by Lewald to resolve his accommodations in the form of conversations and written submissions.

### 1. The restrictions reports and medical records do not show that Lewald's disability was the sole cause of the alleged discriminatory action

Lewald's Response includes his Patient History Report and a more complete medical record than provided in the Motion. *See* ECF No. 135-1, 135-2. These documents do not provide the evidence required to meet the sole cause element of the Rehabilitation Act.

Both the Restrictions Report, provided by the Defendant, and Patient History Report, provided by Plaintiff, show that all Lewald's employment restrictions ended on October 6, 2021, or before. ECF No. 130-7; ECF No. 135-2 at 142. The Restrictions Report and the Patient History Report both show that the "no food service-handle/janitor" employment restriction ended on

---

History Report is susceptible to the same authenticity and hearsay concerns Plaintiff articulates for the Restrictions Report but similarly can also be presented in a form that would be admissible.

[2] Lewald argues that his discovery requests have been left unanswered and summary judgment is inappropriate. ECF No. 135 at 28. Lewald includes letters exchanged between him and attorneys for Defendant discussing the extensive discovery between the parties. *See* ECF No. 135 at 226–230. Discovery closed on October 24, 2024, and motions related to discovery disputes were due by October 10, 2024. ECF No. 124. Plaintiff did not file a motion to compel discovery even though his letters as well as prior filings on the docket show he was aware of his ability to file discovery motions. *See* ECF No. 135-2 at 229 ("I would prefer to obtain discovery responses without the necessity of filing a Motion with the Court."); ECF No. 117 ("Plaintiff's Motion for Permission to Engage in Discovery"). Plaintiff cannot shield himself with arguments that his discovery requests were left unanswered at this stage since the deadline for discovery motions ended four months before the Motion for Summary Judgment was filed. *See* ECF Nos. 124, 130.

October 20, 2020. ECF No. 130-7 at 2–3; ECF No. 135-2 at 138–144. The Patient History Report does have two entries under "Medical Status Summary" of "Not Medically Cleared for Food Service" with the stop date of October 6, 2021. ECF No. 135-2 at 138. These entries are under Lewald's "Medical Status Summary" and do not appear on his Restrictions Report. *Compare* ECF No. 130-7 at 2–3 *with* ECF No. 135-2 at 138.

Regardless of whether the Court looks at the Restrictions Report or the Patient History Report, the "no food service-handle/janitor" employment restriction ended on October 20, 2020. Even looking to the broader "Medical Status Summary" of the Patient History Report, the "Not Medically Cleared for Food Services" restriction ended with the other restrictions on October 6, 2021. ECF No. 135-2 at 138. Plaintiff's own Complaint describes the removal of these restrictions as an "action taken within the electronic processing system to prepare for Plaintiff to transfer, [that] deleted all medical work restrictions." ECF No. 1 ¶ 80. Plaintiff does not allege that his disability was the sole reason these restrictions were removed from his file, nor is it supported by the documents themselves. At most, Plaintiff alleges in the heading of his Complaint the removal was due to negligence. *See id.* ¶ 80–85.

Plaintiff also alleges in his Complaint that the lack of the restrictions on his medical transfer forms was negligent. *See id.* ¶ 86–87. However, these forms accurately reflect that there were no restrictions on Lewald's file at the time they were completed. The screening conducted for his 2021 transfer to SCI-Phoenix, along with its accompanying "DC-491 Intra System Nursing Transfer Checklist" dated December 22, 2021, only describe Lewald as having "pain, low back" under his Chronic Medical Problems. *See* ECF No. 135-1 at 114–15. Lewald's "DC-472N Reception Progress Note" and "DC-472 Progress Note Medical Provider" dated December 29, 2021, indicate "No" for "Physical Disabilities/Limitation" or "Any Special

Requirements/Restrictions (i.e. Bottom Bunk, Detox if not in Infirmary)." ECF No. 135-1 at 106–10, 112–13. The lack of restrictions on these transfer forms reflects that there were no restrictions on his file.

Both restrictions reports and the medical records provide no evidence Lewald's disability was the sole cause of the discriminatory action.

### 2. Lewald's conversations with Defendant's staff do not show that his disability was the sole cause of the discriminatory action

Plaintiff states "[he] must have spoke[n] with at least 20 people" while trying resolve his employment restrictions. ECF No. 130-2 at 16:14–15. These conversations with Defendant's employees as alleged in the Complaint and in the record do not show that Plaintiff's disability was the sole cause of a discriminatory action.

Plaintiff's Complaint alleges he had various conversations with PADOC staff where he discussed his heavy-duty work assignment and lack of employment restrictions. *See* ECF No. 1 ¶¶ 88–132. Plaintiff's descriptions of the conversations do not show his disability was the sole cause the discriminatory action. Lewald's allegations themselves provide alternative reasons for the lack of restrictions and his work assignment. For example, he alleges staff did not know what to do when he asked them for assistance, *id.* ¶ 94 ("[W]hat do you want ME to do?"), told Lewald his requests were beyond the scope of their employment, *id.* ¶ 94 ("I'm not doing that, that's not my job"); *see also* ¶ 104 ("I'm not a records specialist and I can't help you."), or would "look into it" and find no restrictions on the file, *id.* ¶¶ 97, 119. Plaintiff also describes two uncomfortable encounters with Ms. Jackson in which he was told there was no record of his disability in the file and would need to request a transfer of the file from his previous facility. *Id.* ¶¶ 104, 131. The Complaint does not allege that his disability was the sole cause of a discriminatory action.

Where conversations do appear on the record rather than solely as allegations in the Complaint, the conversations do not show that his disability was the sole cause of a discriminatory action. Plaintiff's deposition recounts his conversation with Ms. Jackson where he was told to reach out to his previous facility to transfer his restrictions, ECF No. 130-2 at 15:10–24, along with conversations with other staff, *id.* 16:9–15. Like the allegations in the Complaint, none of these conversations in the record provide evidence that his disability was the sole cause of a discriminatory action.

### 3. Lewald's written requests, grievances, and other documents do not show that his disability was the sole cause of the discriminatory action

From his transfer to SCI-Phoenix on December 28, 2021, until the incident on February 18, 2022, Lewald also attempted to resolve his lack of restrictions by submitting numerous "DC-135A Inmate's Request to Staff Member" forms, "DC-804 Official Inmate Grievance" forms, sick calls, and letters to individuals in positions of authority. *See e.g.* ECF No. 135-1 at 103–4, 117–158. Plaintiff attaches many of these documents, which include responses from employees of the Defendant, as exhibits to his Response. *See id.* These documents similarly do not provide evidence to meet the "sole cause" requirement of a Rehabilitation Act claim. Rather, the documents show PADOC employees tried to explain prison policies to Plaintiff and that his file had no work restrictions when they checked the file.

Lewald's early requests show staff members describing the policies for job placement. On December 29, 2021, Lewald filed a written request to Inmate Employment requesting placement as a block tutor. ECF No. 135-1 at 104. The staff response laid out the policy of placing all transferees in GLP until a work assignment is made and that Lewald should write to the Educational Principal to be considered for the role of block tutor. *Id.* Then on January 13, 2022,

Lewald filed a written request to the Correctional Education and Vocational Coordinator at SCI-Phoenix, asking to be re-assigned to a different work assignment at a higher pay. ECF No. 135-1 at 117. The staff response states "Per policy, you can be placed in any job regardless of pay offered. If you refuse you are placed without pay and lose your payrate. If EDUC hires you you will change jobs." *Id.*

Staff members also explained that he had no restrictions on file. On January 14, 2022, Lewald filed a grievance describing the actions he had taken to date to be assigned to a block tutor role and how his work in the kitchen would be a demotion from his previous employment. ECF No. 135-1 at 119. The Grievance Officer denied his grievance on January 31, 2022, stating "I checked the CAPTOR system and you currently do not have any medical restrictions or limitations that you refer to in this grievance." *Id.* at 120.[3]

On February 7, 2022, Lewald filed another inmate request form asking for assistance in getting his medical restrictions re-instated. ECF No. 135-1 at 145. Restrictions were added to his file, although not all the restrictions Lewald wanted. Employment restrictions appear on the Restrictions Report starting on February 15, 2022: "no high risk of injury," "no intensive labor," "no lifting more than 15 pounds," and "no work at heights/elevations."[4] ECF No. 130-7 at 3. No restriction for food service work was added. *See id.*

---

[3] Responses from staff after the incident provide similar reasons for denying Lewald's grievances. *See e.g.* ECF No. 135-1 at 136 ("I looked at your restrictions and the employment restrictions lasted from 5/24/19 until 10/6/21 only."); *id.* at 139 ("As of 10/7/2021, any/all restrictions that you had, had expired. As such, you were placed on GLP on 12/29/2021 and in Food Services on 1/17/2021[sic]. . . you had no active restrictions."); *id.* at 143 ("[Y]ou had no work restrictions in place. . .").

[4] Lewald's counters in his Response that pursuant to DC-ADM 006 "any observing staff member can make a request for accommodation on behalf of an inmate." ECF No. 135 at 35. Restrictions were in fact added to file after making a request to a staff member. ECF No. 135-1 at 145. Lewald's argument in his Response still does not show that his disability was the sole cause of a discriminatory action. The record shows multiple staff members checked his file for restrictions and proceeded accordingly. Again, the evidence on the record shows at most that any alleged discriminatory action was due to inadvertence or ignorance, not solely based on his disability.

14

Add. 33

The responses to Lewald's requests and grievances show many reasons for his work placement. Lewald himself also provides an additional reason for the alleged discriminatory action. On February 7, 2022, Lewald sent a letter to the Superintendent of SCI-Phoenix requesting that "you or your office [ ] contact SCI-Albion to confirm my averment(s) as perhaps that Facility will confirm what has been (inadvertently) omitted from the CAPTOR system." ECF No. 135-1 at 121-22. Plaintiff's own letter states inadvertence is the reason for the lack of restrictions, not discrimination based on his disability.

Nowhere in the record, or even the allegations in the Complaint, does Plaintiff show his disability was the sole cause of his lack of work restrictions or his work placement. At most, Plaintiff has shown that his work restrictions may have been inadvertently removed. Inadvertence is not sufficient as a matter of law to meet the "sole cause" requirement of the Rehabilitation Act.[5]

## V. CONCLUSION

Plaintiff does not allege nor has he provided evidence that his disability was the sole cause of his denial of requested work accommodations or his work placement. Accordingly, the Court grants Defendant's Motion for Summary Judgement on the final Rehabilitation Act claim under 29 U.S.C. § 794(a). An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

_____

**CHAD F. KENNEY, JUDGE**

---

[5] Since Plaintiff has not provided sufficient facts to meet the Rehabilitation Act's causation requirement, deliberate indifference required to recover compensatory damages is not discussed.

Add. 34

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TROY LEWALD,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA DEPARTMENT** | : | |
| **OF CORRECTIONS "PADOC"** | : | |
| *Defendant.* | : | **NO. 22-cv-04625** |

## O R D E R

**AND NOW,** this **3rd** day of **June 2025**, after review of the docket and consideration of Defendant's Motion for Summary Judgment (ECF No. 130), Defendant's response and objections thereto (ECF Nos. 135–36), and the accompanying exhibits, for the reasons provided in the accompanying memorandum, it is hereby **ORDERED** that Defendant's Motion (ECF No. 130) is **GRANTED**. The Clerk of Court is hereby directed to **CLOSE** this case.

**BY THE COURT:**

**/s/ Chad F. Kenney**
_____
**CHAD F. KENNEY, JUDGE**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

TROY VINCENT LEWALD,                    :
    *Appellant*,

                          :

    v.                                  No.: _____

                          :

PENNSYLVANIA DEPARTMENT
OF CORRECTIONS, *et al.*,                :
                              Pa.E.D. Court No.: <u>22-CV-04625</u>

    *Appellee*.                            :

**<u>NOTICE OF APPEAL</u>**

    NOTICE is hereby given that <u>Troy Vincent Lewald</u>, above named Appellant/Plaintiff, hereby appeals to the United States District Court Eastern District of Pennsylvania from the Order entered on the <u>3rd</u> day of <u>June</u>, 2025. This Order has been entered in the docket as evidenced by the attached copy of the docket.

                                   Respectfully submitted,

Dated: <u>June 11, 2025</u>

                                   Troy Vincent Lewald/NS1262
                                   1200 Mokychic Dr.
                                   Collegeville, PA 19426

Date Filed: 03/11/2026    Page: 98    Document: 34    Case: 25-2166

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TROY LEWALD,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA DEPARTMENT** | : | |
| **OF CORRECTIONS "PADOC"** | : | |
| *Defendant.* | : | **NO. 22-cv-04625** |

### O R D E R

**AND NOW,** this **3rd** day of **June 2025**, after review of the docket and consideration of Defendant's Motion for Summary Judgment (ECF No. 130), Defendant's response and objections thereto (ECF Nos. 135–36), and the accompanying exhibits, for the reasons provided in the accompanying memorandum, it is hereby **ORDERED** that Defendant's Motion (ECF No. 130) is **GRANTED**. The Clerk of Court is hereby directed to **CLOSE** this case.

BY THE COURT:

/s/ Chad F. Kenney
_____
**CHAD F. KENNEY, JUDGE**

Add. 37

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Date Filed: 03/11/2026      Page: 99      Document: 34      Case: 25-2166

TROY VINCENT LEWALD,          :
    *Appellant*,

                     :

    v.                 No.: _____

                     :

PENNSYLVANIA DEPARTMENT
OF CORRECTIONS, *et al.*,          :
                        Pa.E.D. Court No.: <u>22-CV-04625</u>

    *Appellee*.        :

## <u>CERTIFICATION STATEMENT</u>

I, <u>Troy Vincent Lewald</u>, Appellant/Plaintiff *Pro Se*', have read the foregoing documents and hereby verify that the matters alleged herein are true, except to those matters alleged upon information and belief, and, to those matters I believe to be true. I certify under the penalty of perjury that the foregoing is true and correct pursuant to *28 U.S.C.§ 1746*.

Respectfully submitted,

Dated: <u>June 11, 2025</u>

Troy Vincent Lewald/NS1262
1200 Mokychic Dr.
Collegeville, PA 19426

US POSTAGE

quadient
FIRST-CLASS MAIL
IMI
$000.97°
06/12/2025 ZIP 19426
043M31248366

Case: 25-2166    Document: 34    Page: 100    Date Filed: 03/11/2026

Smart Communications/PADOC

SCI- PHX

Name Troy Lewald

Number NS1262

PO Box 33028 1200 Mokychic Dr.

St. Petersburg FL 33730 19426
Collegeville PA 19426

U.S.M.S.
X-RAY

Clerk of Court
Room 2609
U.S. Dist. Court
601 Market St.
Philadelphia, PA 19106

Add. 39